**SAF–GARD PRODUCTS, INC., an Arizona corporation, Plaintiff,**

v.

**SERVICE PARTS, INC., an Indiana corporation, et al., Defendants.**

**No. Civ–70–455 Phx WEC.**

United States District Court,
D. Arizona.

Jan. 11, 1974.

Samuel J. Sutton, Jr., Cahill, Sutton & Thomas, Phoenix, Ariz., for plaintiff.

Eugene C. Knoblock, South Bend, Ind. and O'Connor Cavanagh, Anderson & Westover, Phoenix, Ariz., for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

CRAIG, Chief Judge.

The above entitled cause is one in which plaintiff asserts a patent infringement by defendants. The plaintiff, Saf-Gard Products, Inc., is an Arizona corporation, having its offices and production facilities in Tempe, Arizona. Plaintiff's sole business is the manufacture and sale of radiator accessory kits, which are used for converting standard automotive cooling systems to an improved cooling system, described and claimed in the litigated Patent No. 3,601,181.

The principal defendant, Service Parts, Inc., is an Indiana corporation, having its principal place of business in South Bend, Indiana. The defendant, Service Parts, Inc., manufactures and sells radiator accessory kits, substantially identical to plaintiff's patented product.

The remaining defendants to the action, Balkamp, Inc., an Indiana corporation, having its principal place of business in Indianapolis, Indiana; Genuine Parts Company, a Georgia corporation, having an office and place of business in Phoenix, Arizona; Town and Country Chrysler Plymouth, an Arizona corporation, having its principal place of business in Phoenix, Arizona; Marvin Hawkes, d/b/a Hawkes Radiator Service, having a place of business in Mesa, Arizona. These defendants distribute and resell radiator accessory kits manufactured by the defendant, Service Parts, Inc.

The action was properly instituted in this Court pursuant to Title 35 U.S.C. §§ 271 and 282 et seq., Title 28 U.S.C. §

1338, and Title 15 U.S.C. §§ 1121 and 1125(a).

The action is primarily based upon the defendants' infringement on plaintiff's Patent No. 3,601,181. Plaintiff has specifically charged defendant Service Parts, Inc., with unfair competition and unjust enrichment.

The case was tried extensively to the Court on the issue of liability of the defendants. The issue as to damages was bifurcated to a subsequent date to be determined. The trial commenced on March 15, 1973.

Upon conclusion of the trial the matter was taken under advisement pending submission of memorandum by each of the parties. Memoranda having been received and reviewed by the Court, and the Court being fully advised in the premises reaches the following findings of fact and conclusions of law and judgment:

### FINDINGS OF FACT

1. The litigated Patent No. 3,601,181 entitled "Method and Apparatus for Purging Air from Internal Combustion Engine Cooling Systems," is a continuation of an application which matured into United States Patent No. 3,499,481, which was in turn a continuation in part of an application filed by the inventor Walter C. Avrea, November 15, 1967, and assigned Serial No. 683,223 in the United States Patent Office.

2. The plaintiff, Saf-Gard Products, Inc., is the owner of the entire right, title and interest in and to the litigated patent and all related patents and applications therefor.

3. The fundamental objective of the standard engine cooling system is to transfer excessive heat away from the engine to a point where it can be dissipated into the surrounding environment. This objective is almost universally achieved by circulating a liquid (water) through closed channels within the engine block. Figure I illustrates the components of a standard automobile engine cooling system.

### FIGURE I STANDARD ENGINE COOLING SYSTEM

4. While many attempts have been made to improve, modify or add to the various components in this fundamental cooling circuit, none of these attempts have achieved sufficiently significant results to justify their being permanently incorporated into the cooling systems used on mass produced vehicles. Thus, the standard cooling systems of the late 1960's were fundamentally the same as the cooling systems used at the beginning of the century.

5. Standard cooling systems are typically filled to a maximum level which is two to four inches below the top of the radiator (see Figure I). As the engine runs, the water and air in the cooling system undergo thermal expansion, i. e. their volume increases with increased temperature. In some cooling systems the pressure relief valve in the radiator cap is normally closed and serves to initially seal the cooling system. In such systems internal pressure builds up as the temperature rises and the internal fluids undergo thermal expansion. When the maximum desired internal pressure is exceeded, the pressure relief valve opens to allow excess amounts of air and water to be expelled through the overflow tube until the pressure within the cooling system drops below the maximum desired level.

6. In other cooling systems, the pressure relief valve in the radiator cap is normally open and does not seal the cooling system until boiling occurs. Boiling causes a sudden volumetric surge which closes the pressure valve, allowing internal pressure to build up to a point where the boiling is stopped or decreased. If the pressure increases beyond the maximum desired level, the pressure relief valve is opened and, after a sufficient quantity of air and liquid coolant has been expelled, the pressure declines to the desired level.

7. During the normal operation of a standard cooling system, the air at the top of the radiator is vigorously mixed with the circulating water, becomes entrained in the water and is circulated as a foam throughout the cooling system; i. e., through the radiator, connecting hoses, pump chamber and passageways in the engine. One of the results of this phenomenon is cavitation and boiling.

8. The actual formation of the bubbles, which constitute the physical indicia of cavitation and boiling, is enhanced to a significant extent by the presence of small nuclei which take the form of entrained air bubbles, small rust particles, or other non-liquid foreign matter which may circulate through the cooling system.

9. Cavitation and boiling may be eliminated or controlled through three principal techniques: (a) by decreasing the temperature of the liquid (which adversely affects engine efficiency); (b) by increasing the pressure of the liquid; or (c) by eliminating nuclei from the liquid.

10. The perennial presence of air in the standard internal combustion system has assured the corrosion and oxidation of internal rubber and metallic parts.

11. Another shortcoming inherent in the design and operation of the standard cooling system is the irreversible loss of liquid coolant. When the engine heats and the internal pressure builds to a point which exceeds the design value of the pressure cap, the main valve in the cap opens and a combination of air and coolant flows out through the overflow tube and onto the ground. As the engine cools, the remaining liquid coolant undergoes thermal contraction which creates a partial vacuum in the cooling system; air is drawn back into the radiator to relieve this vacuum. The net result is that the system contains less heat carrying liquid and more corrosion and cavitation inducing air. Persons refiling radiators are periodically exposed to the physical hazard of removing the radiator cap so that the necessary make-up coolant may be added to the system.

*Prior Art*

12. The various prior art patents considered by the Court (some 89 in

number) included among their fundamental objectives: the improvement of engine cooling efficiency, the reduced incidence of boiling, the reduction of cavitation at the water pump, the conservation of liquid coolant, the provision of supplemental coolant reserves, the improvement of coolant circulation, the partial deaeration of the cooling system, the maintenance of appropriate coolant levels, and the improvement of cooling system pressurization and pressure maintenance.

13. Cooling system problems of boiling, cavitation, plugging, coolant loss, antifreeze deterioration, rust, corrosion and overall cooling efficiency have existed since the introduction of the automobile in this country, and certainly before the 1920's. A review of prior art patents also reveals the vast research and development effort which has been continually conducted over the past fifty years in an attempt to eliminate cooling system problems. The leaders in the automotive industry have actively and extensively participated in this effort.

### The Patent

14. In the litigated patent, what Mr. Avrea discovered was that if substantially all air and gaseous matter could be eliminated and prevented from re-entering the cooling system, and if the cooling system could be rapidly pressurized and maintained under pressure, then all of the aforementioned prior art problems could be eliminated, or their effects substantially mitigated. What Mr. Avrea invented was, as the title of his patent reveals, "A Method and Apparatus for Purging Air from Internal Combustion Engine Cooling Systems."

15. The claims in suit, which are reproduced in Appendix A, include method Claim 1, independent apparatus Claim 2 and dependent Claim 3. These claims serve to describe the patented invention both in a legal sense and in a technical sense.

16. The patented apparatus may be most simply described in terms of its installation on a standard automotive cooling system. A vented accumulator is mounted in the engine compartment. An overflow tube is connected between a low point in the accumulator and the overflow outlet on the radiator filler neck. Coolant is added to the accumulator so that it is filled above the low point where the overflow tube communicates with the interior portion of the accumulator. The existing radiator cap is removed and the radiator and engine block are filled as completely as possible with liquid coolant. A special radiator cap is then placed on the radiator filler neck. This radiator cap seals the filler neck opening to ambient atmosphere and thereby prevents the introduction of air or other gaseous matter into the cooling system at this point. The radiator cap includes an outwardly opening main pressure valve which allows the outward passage of fluid whenever the internal pressure of the cooling system exerted against the valve exceeds the counterforce exerted by the main pressure spring. An inwardly opening vent valve, which is also spring loaded to a normally closed position, allows liquid coolant to flow from the accumulator into the radiator when the force exerted by the load spring is overcome during engine cooldown by the difference between atmospheric pressure (in the vented accumulator) and the partial vacuum created in the cooling system by thermal contraction of the coolant. This embodiment of the Avrea invention is shown in Figures 7 and 8 of the litigated patent.

17. Another basic configuration of the invention is shown in Figures 1 through 6 of the Avrea Patent. In this embodiment a simple fill cap is used to plug the existing radiator filler neck, and a valve body including a second filler neck is placed in the upper radiator hose which communicates between the engine block and the radiator itself. A pressure cap having the same sealing and valving characteristics as the one described previously is placed in this hose-mounted filler neck and an appropriate overflow connection is made be-

tween the filler neck and the vented liquid accumulator. This configuration may be preferred in cases where the upper radiator hose is located at an elevation higher than the radiator filler neck, or in occasional "worst case" situations where the prior art cooling system being augmented includes an inaccessible air pocket which must be substantially eliminated.

18. The two basic embodiments of the invention shown in the litigated patent have been reproduced in Appendix B, and the corresponding radiator cap configurations are illustrated in Appendix C.

19. The method by which the Avrea apparatus functions may be simply described in terms of a few cycles of operation of an augmented engine cooling system: After the Avrea device has been installed and the cooling system has been filled to overflowing, there inevitably remain pockets of air throughout the radiator and engine block. The initial objective of the Avrea process is to substantially purge all such air from the cooling system.

20. As the engine initially heats up, the liquid in the cooling system thermally expands and the pressure therein increases and proceeds to compress the pockets of air which remain in the cooling system. When these air pockets have been compressed to a sufficient extent and the design pressure of the main valve has been exceeded, air, liquid and perhaps steam will pass through the filler neck and overflow tube into the lower portion of the vented accumulator. Any gaseous matter expelled during this initial cycle will bubble to the top of the liquid coolant in the vented accumulator and will pass to the ambient atmosphere.

21. After operation, the engine cools down and the liquid coolant therein undergoes thermal contraction. The pressure in the system drops and soon becomes less than atmospheric pressure. When the partial vacuum in the cooling system is sufficient to allow the atmospheric pressure exerted on the liquid in

the vented accumulator to force the spring-loaded vent valve in the pressure cap open, liquid coolant flows into the cooling system. The partial vacuum created by contraction of the coolant is relieved and liquid coolant replaces the air which was expelled during thermal expansion. This heating and cooling cycle is then repeated as the vehicle is intermittently operated until substantially all of the remaining air is purged from the cooling system.

22. When the purging process has been substantially completed there remains only non-compressible liquid coolant in the system. In the absence of compressible gaseous matter, very small increases in temperature result in sufficient thermal expansion of the cooling liquid to cause rapid pressurization of the system to an extent sufficient to substantially prevent boiling of the cooling liquid. In a fully purged system, pressurization of fifteen pounds per square inch (psi) would typically be achieved within approximately one to three minutes after the vehicle is started.

23. The last two steps of the Avrea method describe how the cooling system is maintained in a pressurized air-free state. In subsequent heating and cooling cycles (after air expurgation, and, thus, the capability for full pressurization, has been achieved), liquid coolant is simply transferred for accumulation into the vented accumulator when the pressure of the main valve is exceeded, while accumulated liquid and any necessary makeup liquid is transferred back from the accumulator into the cooling system when the pressure in the cooling system decreases below the opening threshold of the spring-loaded vent valve.

24. By purging substantially all air (including oxygen and other gases) from the cooling system, the Avrea device removes the cause of oxidation and corrosion.

25. It is uncontested that the defendants' accused product, when compared to

the plaintiff's patented product, "functions in substantially the same manner and . . . utilizes substantially the same apparatus to achieve substantially the same results in substantially the same manner." It is uncontested that each of the components manufactured and sold by defendants are functionally identical to the components comprising the patented product manufactured and sold by plaintiff.

26. The suppression of cavitation and boiling results in greatly enhanced cooling efficiency and substantially precludes "hot spots" which would otherwise attenuate engine life and the quality of engine operation.

27. The repression of cavitation achieved by the Avrea system assures prolonged water pump life.

28. In maintaining the cooling system in a pressurized air-free state, the Avrea system also prevents the irretrievable loss of antifreeze or other coolant through the overflow tube, and allows for the addition of makeup coolant at the unpressurized accumulator rather than by removal of the frequently hot, pressurized radiator cap.

### Infringement

29. Each component of the defendant's device is substantially identical to each component of plaintiff's patented device.

30. The principal defendant, Service Parts, Inc., has manufactured and sold the accused devices while the remaining defendants have distributed and resold the accused devices manufactured by Service Parts, Inc.

31. By offering for sale and selling the accused radiator accessory kits, the defendants have provided the ultimate users with the essential components necessary for making and successfully using the combination of elements claimed in the Avrea Patent.

32. A fundamental question presented by this case is whether a person of ordinary skill in the pertaining art, immediately prior to the time at which the Avrea invention was made, would have considered it an obvious development in view of the technical contributions which already existed in the prior art. The Court has reviewed in detail the pertaining prior art, which has taken the form of some 89 United States and foreign patents.

33. The scope and content of the prior art is defined by, and fully set forth in the body of patented technology reviewed by the Court. It is noted that of these 89 prior art patents, over 70 show, describe or suggest the use of a radiator, a radiator cap, an overflow tube, and some form of accumulator, surge tank or condenser. These basic mechanical building blocks seem to have been combined in almost every conceivable manner.

34. Based upon a review of the prior patents and the expert testimony elicited by the parties, it would appear that a "man of ordinary skill in the pertaining art" is an individual who (a) is cognizant of the basic structure and operation of internal combustion engines and engine cooling systems; (b) has some technical training in the properties of materials and the behavior of fluids in flow and under pressure, and (c) who is capable of reading and interpreting engineering drawings and descriptive technical material.

35. Prior to issuance of plaintiff's patent the United States Patent Office conducted an exhaustive search, including all of the patents asserted by defendants to constitute conflicting prior art. This Court does not propose to consider in detail each of the patents searched.

36. It should be noted, however, that in issuing the litigated patent, the Patent Office specifically considered the British Leyland patent, and, thus, also considered the mechanically equivalent structure used on Triumph vehicles such as the TR–4A, manufactured by British Leyland. The Examiner found that the British Leyland patent neither anticipated nor otherwise rendered obvious the

subject matter described and claimed in the application for the Avrea patent.

### Recognition of the Patented Product

37. The trade recognition of the Avrea invention was prompt, widespread and uniformly favorable. Within a few weeks after Mr. Avrea completed development of the commercial device manufactured by plaintiff, *Motor Trend* magazine (plaintiff's Exhibit 12.1, p. 2) tested the Avrea system and published a feature article praising it as a true innovation in cooling system design:

"Just a couple of months ago we criticized that fleet of 1968 sedans we used on a cross-country test for not having adequate cooling systems to cope with modern automotive demands. Now, suddenly, what amounts to a sort of mechanical-minded Messiah—a Mr. W. C. 'Pete' Avrea of Placentia, Calif.—has appeared with an imaginative solution that he devised all by himself and then filed for patent, after Detroit's hundreds of thousands of red-tape-encrusted mightyminds have failed."

The *Motor Trend* article represented the first of a series of such articles and test reports presented in various technical, automotive and consumer oriented publications, including: *Wheels Afield,* November 1968 (plaintiff's Exhibit 12.-2); *Popular Science,* March 1969 (plaintiff's Exhibit 12.3); *Hot Rod,* April 1969 (plaintiff's Exhibit 12.4); *Sports Car Graphic,* March 1970 (plaintiff's Exhibit 12.6); *Westways Magazine,* May 1970 (plaintiff's Exhibit 12.7); *Better Homes and Gardens,* June 1970 (plaintiff's Exhibit 12.8); *Car Life,* July 1970 (plaintiff's Exhibit 12.9), and a laudatory follow-up article in the December 1969 issue of *Motor Trend* (plaintiff's Exhibit 12.5) entitled "Coolant Recovery System Proven."

38. The patented product has been widely adopted by leading vehicle manufacturers and distributors of automotive products. General Motors Corporation sells plaintiff's radiator accessory kits under private label and recommends use of the patented product on Chevrolets, Pontiacs and General Motors trucks and other vehicles. Defendant supplies accused devices to the Buick Division of General Motors Corporation.

39. Ford Motor Company has repeatedly advocated the use of the patented system in a large number of technical and promotional publications. Ford recommends plaintiff's radiator accessory kits, which are packaged by Saf-Gard for distribution by Ford, for use on all Ford, Lincoln and Mercury vehicles. American Motors Corporation also recommends and distributes the patented product manufactured by plaintiff.

40. Leading national firms such as Sears Roebuck and Company, Union Oil Company, Hurst High Performance, Frigequip Corporation, RPS and J. C. Penney Company, Inc., have also recognized and adopted the plaintiff's patented product. Defendant, Service Parts, Inc., alone sold nearly one-quarter million accused devices during its first 36 months of business.

41. The Department of the Army subjected plaintiff's patented device to several months of field testing and confirmed that the Avrea system "performed as reported." As a result of these Army tests, the Government now recommends the patented system for use on all Government vehicles, and requires its use on all air-conditioned vehicles.

42. The inventor revealed that he had spent approximately two years developing and testing different configurations of his invention. It was not until the spring of 1968, shortly after the first *Motor Trend* article appeared, that plaintiff made its first sales of the patented device.

43. Plaintiff initially purchased radiator caps from Stant Manufacturing Company and modified them for use with the Avrea system. However, it was found that these caps did not consistently function to assure complete pressurized deaeration of the cooling system. A series of different cap de-

signs yielded progressively better, but still inadequate results. Finally, Stant proposed to build an entirely new radiator cap which would operate to plaintiff's specifications. The necessary new parts were designed and submitted for plaintiff's approval. Because of the size of plaintiff's initial order, Stant felt justified in absorbing the entire cost of preparing the new tooling required to manufacture the cap.

44. Approximately one year after the plaintiff started its business, the defendant, Service Parts, Inc., learned of the existence of plaintiff and its new product through a feature article that appeared in the April 1969 issue of *Hot Rod Magazine*. On April 22 and 23, 1969, Mr. Drizman, acting on behalf of the defendant, Service Parts, Inc., "attended meetings in Tempe, Arizona with representatives of plaintiff and attempted to negotiate and secure from plaintiff a patent license to manufacture and sell engine cooling devices of the type described in the litigated patent."

45. All available technical, patent and business information relating to plaintiff's new product, was disclosed to defendant, Service Parts, Inc., in an effort to encourage the defendant to enter into a royalty producing patent license. The source of plaintiff's special radiator caps was revealed, the results of plaintiff's research, development and experimentation were disclosed; and the detailed technical reasons for the successful operation of plaintiff's devices were both demonstrated and explained.

46. At the close of the April 1969 discussions with the inventor and representatives of the plaintiff, defendant, Service Parts, Inc., purchased one of plaintiff's devices which was contained in a carton bearing plaintiff's common law trademark "Coolant Recovery System" and the statutory notice "Patent Pending."

47. On June 17, 1969, only 55 days after meeting with plaintiff's representatives, the defendant, Service Parts, Inc., without performing any research, development or experimentation, sold the first of approximately one-quarter million devices which are structurally and functionally identical to plaintiff's patented product.

48. Prior to its first sales of the accused radiator accessory kits defendant was unaware of any commercially available device having the characteristics of plaintiff's patented product.

49. Literature prepared and distributed by defendant has referred to the accused devices as "revolutionary radiator accessories." According to defendant's president, the term "revolutionary" connotes "something astoundingly new or different."

50. Defendant has, from the outset of its production, prominently included the term "Coolant Recovery Unit" on the labels affixed to cartons in which the accused devices are marketed.

51. Defendant admits that there is no difference in connotation between "Coolant Recovery System" as used by the plaintiff and "Coolant Recovery Unit" as used by the defendant. There is a strong likelihood that the ultimate purchaser of these devices would attribute no difference in connotation to these terms. The defendant uses the term "Coolant Recovery Unit" only on its labels, while using other terms to describe the accused product itself. Some fourteen defendants to this and other actions instituted by plaintiff have had adverse consent judgments entered enjoining their further use of plaintiff's common law trademark "Coolant Recovery System" in conjunction with the sale of radiator accessory kits, and in some instances awarding damages to plaintiff.

52. By the time defendant had entered the market, plaintiff's mark, "Coolant Recovery System," had been widely used in conjunction with sales of the patented product, and had appeared in the national publications which featured plaintiff's new product. Furthermore, plaintiff. had expended substantial time and effort in perfecting a commercially acceptable radiator cap for use with the

patented system. Defendant was able to immediately secure an ample supply of radiator caps identical to those used by plaintiff simply by informing Stant that defendant desired to "manufacture and market a 'Coolant Recovery Unit'." It was unnecessary for defendant to provide any further design qualifications. In its instructional material, defendant refers to this component as a "special radiator cap."

## CONCLUSIONS OF LAW

■ 1. The inventor had conceived his invention and built experimental prototypes during 1966. His first patent application was filed on November 15, 1967. These facts serve to establish "the time the invention was made" within the meaning of 35 U.S.C. § 103.

■ 2. The claim charts showing the correspondence between the language of the apparatus claims and the two alternative embodiments of the invention shown in the patent drawings, summarize and define the patented subject matter within the meaning of 35 U.S.C. § 103.

3. The three litigated claims particularly point out and distinctly claim the subject matter which Mr. Avrea regarded as his invention. The claim language was of sufficient clarity and distinctness that it was used in large part to describe the structure of the defendants' accused devices when installed for operation on a standard internal combustion engine cooling system.

4. The patent expert witnesses agreed that an "enabling disclosure", i. e. one complying with paragraph 1 of 35 U.S.C. § 112, is a disclosure which would enable a person of ordinary skill in the art to make and use the patented invention. The experts testified that a man of ordinary skill in the art would have little difficulty in copying and using the patented product, even without the assistance of the detailed drawings and written description contained in the Avrea Patent.

5. The embodiment of the Avrea invention which is illustrated in Figures 7 and 8 of the litigated patent (plaintiff's Exhibit 1.1) was added by way of a continuation-in-part application filed March 24, 1969 (plaintiff's Exhibit 2.1, pp. ¼ and ½). This particular embodiment of the invention had already been set forth in the objects (plaintiff's Exhibits 5.1; 2.1, p. 3) described in the specification (plaintiff's Exhibits 5.2; 2.1, p. 9), and specifically claimed in the original application as filed November 15, 1967 (plaintiff's Exhibit 5.3, 5.4, 5.5; 2.1, pp. 11 and 12). The unrebutted testimony of plaintiff's patent was that apparatus Claim 5 filed on November 15, 1967, was limited solely to the Figure 7 embodiment of the invention (plaintiff's Exhibit 5.5). Thus, the drawings (Figures 7 and 8) added in the continuation-in-part application did no more than illustrate the subject matter already in the objects, description and claims as originally filed.

6. The litigated patent matured from a continuation application (plaintiff's Exhibit 2.2, p. 32) filed March 9, 1970. This third application was co-pending with the second application which, in turn, had been co-pending with the first application. This chain of applications was fully identified on the face of the litigated patent (plaintiff's Exhibit 1.1).

7. Since method Claim 1 is a description of the inherent function or use of the Avrea apparatus (plaintiff's Exhibits 5.7; 2.3, p. 32), it too was fully disclosed in the original application as filed on November 15, 1967.

8. The claims in suit precisely cover the subject matter disclosed in the drawings and specification of the original application filed on November 15, 1967 (plaintiff's Exhibits 3.1–3.10). The claims apply equally to both the first and second alternative embodiments (plaintiff's Exhibits 3.1–3.10). The amendment of these claims during the prosecution of the applications leading up to the litigated patent amounted to no more than a narrowing of the claims to articulate the limitations implicit in

the specification and drawings, but not explicit in the claims themselves. This narrowing procedure inevitably results from the ordinary give-and-take of Patent Office procedures. It amounts to a shaping of the definition of that which is sought to be patented, while giving consideration to the limitations of the prior art. The scope of the claims as originally filed extended to and included (plaintiff's Exhibit 5.5) the subject matter covered with greater specificity in litigated Claims 1, 2 and 3 (plaintiff's Exhibits 3.1–3.11). These ultimately allowed claims added nothing new.

9. The Court finds no fraud to have been exercised on the Patent Office as asserted by defendants.

10. Fundamentally, patent rights are Constitutionally created individual property rights of limited duration which pertain to new discoveries and inventions. The Constitution of the United States specifically provides for this individual right in Article I, section 8, clause 8:

"The Congress shall have power . . .. To promote the progress of science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

11. Determination of whether or not a particular inventor is entitled to this exclusive Constitutional right depends upon the application of three fundamental statutory tests embodied in Title 35 U.S.C. §§ 101, 102 and 103. These tests are applied both by the United States Patent Office in determining whether an individual should receive a patent grant, and by the federal district courts in instances where, as here, a litigant defending a civil action for infringement seeks to establish that the Patent Office has improperly applied the tests.

12. In order to pass the first test of patentability, the subject matter sought to be patented must "promote the progress of . . . useful Arts." (Constitution of the United States of America, Art. I, § 8, Cl. 8.) In the words of

the statute, the invention or discovery must relate to a "useful process, machine, or composition of matter, or any new and useful improvement thereof."

13. The second test of patentability requires that the subject matter sought to be patented not have been "anticipated by the prior art." In statutory terms, an invention is new or not anticipated if there is no earlier patent or printed publication which identically discloses or describes the invention, and there has been no public use or sale in the United States of an identical device, structure or process. 35 U.S.C. § 102.

14. This second test of patentability is a technical one, and, while it is frequently invoked by the Patent Office in refusing to grant patents, it only rarely provides the sole basis for adjudication denying patentability: "Anticipation [under 35 U.S.C. § 102] is strictly a technical defense. Unless all of the same elements are found in exactly the same situation and united in the same way to perform the identical function in a prior pleaded patent, there is no anticipation." Stauffer v. Slenderella Systems of California, Inc., 254 F.2d 127, 128 (9th Cir. 1957); National Lead Company v. Western Lead Products Company, 324 F.2d 539, 544 (9th Cir. 1963); Walker v. General Motors Corp., 362 F.2d 56, 59 (9th Cir. 1966); Ceramic Tilers Supply, Inc. v. Tile Council of America, 378 F.2d 283, 284–285 (9th Cir. 1967), see also 439 F.2d 1124 (9th Cir. 1971). See also: McCullough Tool Co. v. Well Surveyers, Inc., 343 F.2d 381, 398 (10th Cir. 1965); Scaramucci v. Dresser Industries, Inc., 427 F.2d 1309 (10th Cir. 1970). None of the prior art items considered at trial come within this definition. The Avrea Patent was not "anticipated" by the prior art.

15. The third and ultimate test of patentability is "non-obviousness." Pursuant to this third test, an invention may not be patented "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would

have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103.

16. In 1966 the Supreme Court of the United States decided three patent cases, frequently referred to as the "Trilogy." Graham v. John Deere Co. and Colgate-Palmolive Company v. Cook Chemical Company, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). These cases related to the applicability of the "non-obviousness" test set forth in Title 35 U.S.C. § 103:

". . . the § 103 condition, which is but one of the three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or non-obviousness, these inquiries may have relevancy." 383 U.S. 1 at 17, 18, 86 S.Ct. 684 at 694 (1966); *See also*, Reeves Instrument Corp. v. Beckman Instruments, Inc., 444 F.2d 263 (9th Cir. 1971), cert. denied, 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971).

17. Because of the high level of expertise possessed by the Patent Office staff of engineers and patent lawyers in applying the series of inquiries necessary to determine non-obviousness, Congress has enacted a statutory presumption: "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it. . . .." 35 U.S.C. § 282.

18. The statutory presumption of validity arising from the grant of a patent is strengthened where the principal prior art relied upon by the defendant has already been specifically considered and rejected by the experts of the United States Patent Office. Neff Instrument Corp. v. Cohu Electronics, Inc., 298 F.2d 82, 86, 87 (9th Cir. 1961); Ekstrom-Carlson & Co. v. Onsrud Machine Works, Inc., 298 F.2d 765, 768 (7th Cir. 1962); Amp, Incorporated v. Vaco Products Co., 280 F.2d 518, 521 (7th Cir. 1960). During the prosecution of the Avrea Patent, the Examiner reviewed the patents to Herbon and British Leyland which the defendants considered to be the most pertinent items of prior art.

19. The United States Supreme Court and the Ninth Circuit Court of Appeals have repeatedly stated that the party seeking to invalidate a patent bears a heavy burden of persuasion and can overcome the statutory presumption of validity "only by clear and convincing proof." Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983 (1937); Radio Corp. of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 7, 54 S.Ct. 752, 78 L.Ed. 1453 (1934); Patterson-Ballagh v. Moss, 201 F.2d 403, 406 (9th Cir. 1953); Moon v. Cabot Shops, Inc., 270 F.2d 539, 541 (9th Cir. 1959); Hayes Spray Gun Co. v. E. C. Brown Co., 291 F.2d 319, 322 (9th Cir. 1961); Reeves Instrument Corp. v. Beckman Instruments, Inc., D. C., F.Supp. (161 U.S.P.Q. 450, 479), aff'd 444 F.2d 263 (9th Cir. 1971), cert. denied, 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971).

20. In determining the validity of a patent, the prior art patents and publications must be viewed through the eyes of a person having ordinary skill in the art of a point in time immediately preceding the patentee's invention and without reading into the prior art the teachings of the litigated patent. Hindsight must play no part in determining

what would have been obvious under Title 35 U.S.C. § 103. The Ninth Circuit Court of Appeals stated:

"It is of no significance that viewed after the event, the means . . . adopted seem simple and such as should have been obvious to those who worked in the field, but this is not enough to negative invention. Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275 [64 S.Ct. 593, 88 L. Ed. 721]. Now that it has succeeded, it may seem very plain to anyone that he could have done it as well. This is often the case with inventions of the greatest merit. Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 446 [22 S.Ct. 698, 46 L.Ed. 715, 968]. See Patterson-Ballagh Corp. v. Moss, [9th Cir.] 201 F.2d 403; National Sponge Cushion Co. v. Rubber Corp., 9 Cir. 1961, 286 F.2d 731, 735." Neff Instrument Corp. v. Cohu Electronics, Inc., 298 F.2d 82, 88 (9th Cir. 1961).

21. The probative value of defendants' argument that the Avrea invention is no more than an "aggregation" of old and well-known elements, has been analyzed in Reeves Instrument Corp. v. Beckman Instruments, Inc., 444 F.2d 263 (9th Cir. 1971), cert. denied, 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971):

"The [aggregation] argument is that the [plaintiff's] patent fails to satisfy the constitutional standard of patentability enunciated in A&P [Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162] because the claimed invention consists of old elements . . . which operate within the claimed combination in the same fashion as they have always operated in the prior art.

"This argument fails on two grounds. First, it misconstrues the import of the A&P decision. Second it suggests an analytical approach to patentability which is directly contrary to the statutory language of 35 U.S.C. § 103 which provides that the inquiry into patentability must be drawn toward the 'subject matter as a whole' and not to the elements of a claimed combination and their individual novelty.

"The claims in issue here are, in statutory language, 'machine' claims [citing 35 U.S.C. § 101]. They define a new 'machine' which is composed of certain defined elements in combination. Carried to its logical conclusion, the argument here would result in a rule to the effect that A&P precludes the patenting of virtually every new mechanical or electrical device since the vast majority, if not all, involve the construction of some new device (or machine or combination) from old elements.

. . . . . .

Carried even further, there is doubt that anything would be patentable. Not only are all mechanical or electrical devices constructed of old elements but all chemical products are the result of combining known chemical elements. To continue to reduce patentability with a view toward uses of old elements would ultimately lead to the conclusion that those 'inventions' which survive are unpatentable because they amount to no more than a discovery of something which already existed in nature. See Vitamin Technologists, Inc. v. Wisconsin Alumni Research Foundation, 146 F.2d 941 (9th Cir. 1944)." 444 F.2d 263, 270–271 and n. 4

22. Patent validity is bolstered where, as in the instant case, the patented device achieves unexpected results, yet is composed of mechanical elements which individually have been long known in the art. All newly invented devices are constructed from old elements. The fact that persons skilled in the art have failed to combine these readily available elements to achieve the patented device strongly indicates that the new combination described by the patentee was by no means an obvious one. Reeves Instrument Corp. v. Beckman Instruments, Inc., See the District Court Opinion: F.Supp. (161 U.S.P.Q. 450, 480) and the

**270**

affirming Appellate Decision: 444 F.2d 263, 470–473 and n. 4 (9th Cir. 1971), cert. denied, 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971); Neff Instrument Corp. v. Cohu Electronics, Inc., 298 F.2d 82, 87 (9th Cir. 1961).

23. The extent to which a patented product achieves commercial success is an ascertainable and reliable indicator of adoption and commercial use, and, thus, of non-obviousness. In the present case there is a substantial volume of evidence indicating that both plaintiff's patented product and defendant's structurally identical product have enjoyed prompt and considerable commercial success. It is well established that: "The presumption of validity which attaches to an issued patent is strengthened when the patented device meets with commercial success;" Stearns v. Tinker & Rasor, 220 F.2d 49, 58 (9th Cir. 1955); Coleman Co. v. Holly Mfg. Co., 233 F.2d 71, 80 (9th Cir. 1956), cert. denied 352 U.S. 952, 77 S.Ct. 326, 1 L.Ed.2d 243 (1956); Neff Instrument Corp. v. Cohu, 298 F.2d 82, 87 (9th Cir. 1961); Tile Council of America v. Ceramic Tilers Supply, 257 F.Supp. 339 (S.D.Cal.1965), aff'd, 439 F.2d 1124 (9th Cir. 1971).

24. A consideration of the patented prior art reveals that the very firms which had earlier been seeking a practical solution to the cooling system problems solved by the Avrea system are now purchasing the patented product from plaintiff and using it to the exclusion of that which had gone before. Where, as in the instant case, "several others in the art have attempted to solve the same problem and have not arrived at the solution claimed by the patent in suit, the statutory presumption of validity is substantially strengthened." Reeves Instrument Corp. v. Beckman Instruments, Inc., supra; See also: Goodyear Tire & Rubber Co., Inc. v. Ray-O-Vac, supra; C. & A. Potts & Co. v. Creager, 155 U.S. 597, 15 S.Ct. 194, 39 L.Ed. 275 (1895); United States v. Adams supra, and Neff Instrument Corp. v. Cohu Electronics, Inc., supra.

25. The laudatory recognition of the patented product in numerous trade publications almost immediately after its introduction on the market is a further indication that those skilled in the art considered the Avrea system to be a significant technical contribution. Goodyear Tire & Rubber Co., Inc. v. Ray-O-Vac, supra; Graham v. John Deere Co., supra, United States v. Adams, supra.

26. The non-obviousness of the Avrea invention is bolstered by the very fact that "the defendants immediately, upon seeing the article designed and manufactured by [plaintiff], appropriated it and advertised it to the trade as 'revolutionary'." Sel-O-Rak Corp. v. Henry Hanger & Display Fix. Corp., 232 F.2d 176, 178 (5th Cir. 1956); Ibis Enterprises, Ltd. v. Spray-Bilt, Inc., 220 F.Supp. 65, 76 (S.D.Fla.1963).

27. In view of the foregoing findings of fact and conclusions of law, it is concluded that the differences between the subject matter claimed in the litigated patent and the prior art are such that a person of ordinary skill in the pertaining art would not have considered them to have been obvious at the time the invention was made. The Avrea system was not an obvious development in the automotive cooling system technology. Moreover, it is apparent that the automotive industry, with all of its progress and expertise, had not solved the particular problem which the Avrea patent solved, even though a solution had been sought for something in the neighborhood of sixty years of endeavor.

28. It is concluded that the disclosure contained in the litigated patent is sufficient to enable a man of ordinary skill in the art of automotive cooling systems to make and use the Avrea invention.

29. It is concluded that the claims of the litigated patent particularly point out and distinctly claim the subject matter which Mr. Avrea regards as his invention.

■ 30. The second embodiment of the Avrea invention illustrated in Figures 7 and 8 of the litigated patent, although added to the continuation-in-part filed March 24, 1969, had been described, claimed and set forth in the objects of the original patent application as filed on November 15, 1967. The application filed March 24, 1969, was a continuation-in-part only in the strict technical sense, since it did no more than illustrate that which had already been specifically disclosed and claimed in the prior application: These two applications were co-pending in the Patent Office and the second application referred to and identified the first. The continuation application filed March 9, 1970, was co-pending with the second patent application and identified both it and the first application filed by the inventor. The drawings and specification in the third application were identical to those filed in the second. The litigated Claims 1 and 2 identically cover the subject matter contained in the preceding applications. Accordingly, as to the subject matter covered by the litigated claims, the patentee is entitled to the benefit of the filing date of the first filed patent application November 15, 1967. 35 U.S.C. § 120; Indiana General Corp. v. Lockheed Aircraft Corp., 408 F. 2d 294, 297 (9th Cir. 1968); In Re Henriksen, 399 F.2d 253, 55 C.C.P.A. 1384 (1968); Acme Highway Products Corp. v. D. S. Brown Co., 431 F.2d 1074, 1078 (6th Cir. 1970).

The Court of Appeals for the Ninth Circuit has stated:

" 'Not only have later or divisional applications not been dealt with in a hostile spirit by the courts, but, on the contrary, designed as they are to secure the patent to the first discoverer, they have been favored to the extent that, where an invention clearly disclosed in an application, as in this case, is not claimed therein, but is subsequently claimed in another application, the original will be deemed a constructive reduction of the invention to practice, and the later one will be given the filing date of the earlier, with all of its priority of right.' The appellant here has stronger equities than the patentee in the case last cited, for his invention is not only disclosed in the original application, but it was substantially claimed therein." Carson v. American Smelting and Refining Co., 4 F.2d 463, 470, 471 (9th Cir. 1925), [adopting the law set forth in Chapman v. Wintroath, 252 U.S. 126, 137, 40 S.Ct. 234, 64 L.Ed. 491 (1920)]. *See also*; Indiana General Corp. v. Lockheed Aircraft Corp., 408 F.2d 294, 297 (9th Cir. 1968); Hovlid v. Asari, 305 F.2d 747, 751, 752 (9th Cir. 1962).

■ 31. Defendants have asserted that the litigated patent is invalid "because the invention claimed in said patent is substantially identical with an invention claimed in a prior art patent granted on an application filed by the same inventor." It is well established that the validity of a second patent may not be challenged on the ground that the same subject matter has been covered by different claims in an earlier patent where, as is abundantly clear from the Avrea file history: (a) The two patents are in the name of the same inventor; (b) The two patents terminate on the same date; (c) The applications upon which the two patents were based were co-pending in the Patent Office, and (d) The two patents are and remain commonly owned. 35 U.S.C. §§ 120 and 253; Manual of the Patent Examining Procedure, § 804.02, United States Patent Office (3rd Edition, 1961; Revision 20, June 1969); In Re Braithwaite, 379 F.2d 594, 54 A. 1589.

■ 32. Defendants have asserted that, in issuing the litigated patent, the Patent Office failed to consider relevant items of prior art and that the patentee intentionally withheld or misrepresented facts material to the patentability of the subject matter claimed in the litigated patent. This assertion is without merit: The prior art relied upon by defendants at trial had either been separately cited by the Patent Office, or had been no-

ticed to the Patent Office by the patentee. As to those patents cited by the patentee, the Examiner confirmed that he had considered and rejected them as less pertinent, not anticipatory and insufficient to render the claimed invention obvious. Furthermore, it would appear that the operative facts upon which each of the asserted defenses is based can be found within the Patent Office file history itself.

22. "In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it." Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950); Stearns v. Tinker & Rasor, 252 F.2d 589, 599 (9th Cir. 1957).

Litigated Claim 3 has been infringed. The phraseology used in the Pre-Trial Order to describe defendants' accused devices, when installed for operation on an internal combustion engine cooling system, corresponds as closely as is grammatically possible to the language of litigated apparatus Claims 2 and 3. Defendants' patent expert concurred that method Claim 1 describes the inherent function, operation or use of the accused devices. It is uncontested that the accused device, when compared to the patented device, "performs substantially the same function in substantially the same way to obtain [substantially] the same result." Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., *supra,* 339 U.S. at 608, 70 S.Ct. at 856.

34. Title 35 U.S.C. § 271 defines three independent categories of infringement: "direct infringement," "inducement to infringe" and "contributory infringement." A person is said to fall within one of these categories if that person: (a) makes, uses or sells the patented invention (35 U.S.C. § 271(a)) or (b) actively induces others to either make, use or sell the patented invention (35 U.S.C. § 271(b)) or (c) sells a component constituting a material part of the invention, knowing the component to be especially made or especially adopted for use in an infringement, and not suitable for substantial non-infringing use (35 U.S.C. § 271(c)).

35. The activity of the defendants falls within all three categories of statutory patent infringement: Defendant, Service Parts, Inc., is liable as a direct infringer within the meaning of Title 35 U.S.C. § 271(a) because its officers and employees have during the course of their duties, installed and used the accused devices in the claimed combination.

36. Defendants have actively induced others to infringe plaintiff's patent by: (a) selling the accused devices with specific instruction on how to install same to form the infringing combination; (b) advertising and otherwise promoting the use of the accused devices in the infringing combination, and (c) assisting, encouraging and abetting others in the resale of the accused devices. 35 U.S.C. § 271(b); Fromberg, Inc. v. Thornhill, 315 F.2d 407, 411 (5th Cir. 1963). *See also*: International Mfg. Co., Inc. v. Landon, Inc., 336 F.2d 723, 728 (9th Cir. 1964), cert. denied Jacuzzi Bros. v. Landon, 379 U.S. 988, 85 S.Ct. 701, 13 L.Ed.2d 610 (1965); Reliance Construction Co. v. Hassam Paving Co., 248 F. 701, 704 (9th Cir. 1918).

37. Because the accused devices sold by the defendants are installed by the ultimate purchaser for use in an infringing combination, the defendant, Service Parts, Inc., has contributorily infringed plaintiff's patent under Title 35 U.S.C. § 271(c) by selling the accused devices, knowing that the resultant combination would constitute an infringement of plaintiff's patent, and knowing that there exists no substantial non-infringing use for the accused devices. Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 481, 84 S. Ct. 1526, 12 L.Ed.2d 457 (1964).

38. The evidence presented at trial indicates that the defendant, Serv-

ice Parts, Inc., copied plaintiff's patented product. Because said defendant has "faithfully copied" plaintiff's patented device, the "defendant's infringing conduct, being intentional, willful and in complete disregard of plaintiff's patent rights" makes this litigation exceptional within the meaning of Title 35 U.S.C. §§ 284 and 285. Coleman Co., Inc. v. Holly Mfg. Co., 269 F.2d 660, 666 (9th Cir. 1959), cert. denied, 352 U.S. 952, 77 S. Ct. 326, 1 L.Ed.2d 243 (1956); American Safety Table Co. v. Schreiber, 415 F.2d 373, 378 (2nd Cir. 1969) [citing *Coleman*]; Copease Mfg. Co. v. American Photocopy Equipment Co., 298 F.2d 772 (7th Cir. 1961).

39. In the instant case "the infringer from the outset took a completely untenable position on the validity of the patent." Livesay Window Co. v. Livesay Industries, Inc., 251 F.2d 469, 476 (5th Cir. 1958); Hartford National Bank & Trust Co. v. E. F. Drew & Co., 188 F. Supp. 353 (Del.1960), aff'd, 290 F.2d 589 (3rd Cir. 1961), cert. denied, 368 U. S. 825, 82 S.Ct. 45, 7 L.Ed.2d 29 (1961). The instant case is an exceptional one within the meaning of 35 U.S.C. §§ 284 and 285.

40. The evidence discloses that defendant, Service Parts, Inc., is guilty of unfair competition in using confidential information for the purpose of manufacturing and marketing a competitive device identical to plaintiff's invention.

*See* Sandlin v. Johnson, 141 F.2d 660 (8th Cir. 1945); Restatement of Torts, § 757 and appended comments. *See also* Milgrim, Trade Secrets, §§ 4.01–4.03 and 5.03[2].

41. Practically since its inception, plaintiff has marketed its device under the designation "Coolant Recovery System." Since defendant, Service Parts, Inc., has entered the market, it has designated its device as a "Coolant Recovery Unit." The evidence discloses that some seven consent decrees have been entered restricting the use of the name "Coolant Recovery System." This is a significant circumstance in that it is recognized in the market place that plaintiff's "Coolant Recovery System" has acquired a significant or secondary meaning. While the words used are generic in nature, the combination used by defendant, Service Parts, Inc., is so close to that used by plaintiff that it becomes confusing and misleading to the buying public. Such action on the part of said defendant constitutes unfair competition. 15 U.S.C. § 1125(a); Boice v. Stevenson, 66 Ariz. 308, 187 P. 2d 648.

42. If any finding of fact herein involves matters of both fact and law, to the extent that any such finding of fact may be construed more properly as a conclusion of law, the same is hereby adopted and incorporated herein as a conclusion of law.

APPENDIX A:

LITIGATED CLAIMS 1, 2, & 3

1. In a method of operating a closed cooling liquid circuit for an internal combustion engine, which circuit includes a circulation pump, which method includes

independently of said pump creating a fluid pressure sufficiently high to prevent the formation of steam within said cooling circuit, under conditions where the temperature of the liquid in the cooling circuit ranges between values above and values below the boiling point of the liquid at atmospheric pressure,

applying said fluid pressure to the liquid in said cooling circuit, and

thereafter continuously maintaining said fluid pressure on said liquid

in the cooling circuit independently of the operating temperature thereof and independently of the speed of the engine from and including zero upwardly to a maximum value,

the improvements in said method whereby an intermittently operated internal combustion engine which normally contains air and a thermally expandable coolant liquid in said cooling circuit is cooled with improved reliability and efficiency, which improvements comprise in combination the steps of:

a. substantially completely purging air from said cooling circuit by

    i.   expelling air and excess coolant liquid from said cooling circuit as said engine heats to operating temperature and said coolant liquid expands;

    ii.  separating said expelled air from said excess coolant liquid;

    iii.  introducing into said cooling circuit as said coolant liquid cools from operating temperature and contracts a volume of coolant liquid equal to said excess coolant liquid and said expelled air;

    iv.  repeating steps (i), (ii), and (iii) until substantially all air has been expelled from said cooling circuit and said cooling circuit is substantially completely filled with said thermally expandable coolant liquid;

b. creating an effective fluid pressure sufficient to substantially prevent boiling of the cooling liquid within said cooling circuit by thermally expanding said liquid at a temperature below its normal boiling point in said cooling circuit;

c. withdrawing coolant liquid from said cooling circuit when the pressure therewithin exceeds said effective pressure;

d. introducing makeup coolant liquid into said cooling circuit when the pressure therein decreases from said effective pressure to a lower pressure.

2. A cooling system for intermittently operated internal combustion engines, during which intermittent operation said engine

heats from ambient temperature to an elevated operating temperature, and

cools after operation thereof toward ambient temperature, which cooling system comprises:

a. a radiator including:

    1.  an outlet for conveying coolant through a first conduit to the combustion engine;

    2.  an inlet for receiving coolant through a second conduit from the combustion engine;

b. an opening disposed at a high point in the system and adapted to receive a pressure cap;

c. a pressure cap for said opening, said pressure cap including means for sealing said opening to the ambient atmosphere and further including first and second pressure loaded check valves;

    1.  said first check valve adapted to permit fluid flow through said opening in a first direction when its threshold pressure is exceeded;

    2.  said second check valve adapted to permit fluid flow through said opening in a second direction opposite said first direction when its threshold pressure is exceeded;

d. an accumulator, said accumulator being provided with a vent to ambient atmospheric pressure;

e. a third conduit providing fluid communication between a low point in said accumulator and said opening, said low point being disposed below a predetermined minimum coolant level in said accumulator, said third conduit cooperating with said pressure cap to conduct fluid in said first direction when said first check valve is open and to conduct coolant in said second direction when said second check valve is open;

f. a quantity of makeup liquid coolant in said accumulator sufficient to maintain a level of coolant therein always above said low point as said engine cools to ambient temperature from said operating temperature.

3. The cooling system of claim 2 in which said opening is disposed at a high point in said radiator.

APPENDIX B

FIRST ALTERNATIVE

SECOND ALTERNATIVE

APPENDIX C

FIRST ALTERNATIVE

SECOND ALTERNATIVE

Figures 1 and 7 from United States
Patent No. 3,601,181 (AVREA)

Figures 3 and 8 from United States
Patent No. 3,601,181 (AVREA)

## JUDGMENT

Pursuant to the Findings of Fact and Conclusions of Law filed simultaneously herewith,

It is ordered, adjudged and decreed:

1. That United States Patent No. 3,601,181 is valid as to Claims 1, 2 and 3.

2. That the plaintiff, Saf-Gard Products, Inc., is the owner of the entire right, title and interest in and to United States Patent No. 3,601,181.

3. That the defendants, Service Parts, Inc.; Balkamp, Inc.; Genuine Parts Company; Town & Country Chrysler Plymouth and Marvin Hawkes have infringed Claims 1, 2 and 3 of United States Patent No. 3,601,181.

4. That this is an exceptional patent case within the meaning of Title 35 U.S.C. §§ 284 and 285.

5. That the defendant, Service Parts, Inc., has unfairly competed with plaintiff in the business of manufacturing and selling radiator accessory devices.

6. That the defendants, Service Parts, Inc.; Balkamp, Inc.; Genuine Parts Company; Town & Country Chrysler Plymouth and Marvin Hawkes, their officers, agents, attorneys, servants and employees and those persons receiving notice hereof, who are in active concert or participation with any of said defendants, are hereby restrained and enjoined, commencing on the date of this Judgment and continuing until March 11, 1987, from directly or indirectly infringing, inducing the infringement of, or contributing to the infringement of, United States Patent No. 3,601,181 by making, using or selling any device, or by practicing any method which embodies the invention claimed in said patent or the substantial equivalent thereof.

7. That plaintiff's costs and disbursements in this litigation shall be taxed against defendants upon filing of an appropriate Bill of Costs.

8. This Judgment is a final judgment on the legal issues of liability.

This Court retains jurisdiction for the purpose of resolving the issue of the amount of damages to be awarded plaintiff.