**ADM CORPORATION, Plaintiff,**

v.

**SPEEDMASTER PACKAGING CORPO-RATION et al., Defendants,**

v.

**Armando D. MOTA et al., Third-Party Defendants.**

**Civ. A. No. 551–68.**

United States District Court,
D. New Jersey.

Oct. 18, 1974.

As Amended Nov. 7, 1974.

Popper, Bain, Bobis, Gilfillan & Rhodes, Newark, N. J., for plaintiff and third-party defendants, by John N. Bain, and John G. Gilfillan, III, Newark, N. J.

Shanley & Fisher, Newark, N. J., for defendants Speedmaster and Dennison, by Frank L. Bate, Newark, N. J.

Pennie, Edmonds, Morton, Taylor & Adams, New York City, of counsel for defendant Speedmaster, by James G. Foley and Philip T. Shannon, New York City.

Thomas F. Curry, Framingham, Mass., for Dennison Mfg. Co., defendant.

## OPINION

STERN, District Judge.

This is a declaratory judgment action under 28 U.S.C. §§ 2201 and 2202 brought by the Plaintiff ADM Corporation,[1] a New Jersey corporation having its principal place of business in Clifton, New Jersey (hereinafter ADM), against Defendant Speedmaster Packaging Corporation, a New York corporation having its principal place of business in Fairfield, Connecticut (hereinafter Speedmaster), alleging invalidity and non-infringement of the claims of U.S. Patent No. 3,339,826 for a split back shipping envelope[2] (hereinafter

1. ADM is the successor in interest to all of the rights and liabilities of P. L. Envelope Manufacturing, Inc., the original Plaintiff in this action, for which ADM was substituted.

2. During the course of the trial, the Court marked certain exhibits which are identified as follows:

C–1 is a tubular polyethylene envelope, heat-sealed on two sides, personally produced by Mota for the trial to show that he could mechanically produce such a tubular envelope with 100% adhesive on its back on a machine built in 1964. (Tr. 179–180)

C–2 is a Poly-Kraft envelope consisting of a front panel of polyethylene and a rear panel of Poly-Kraft having pressure-sensitive adhesive and release paper and a slit through the release paper, which was produced by Mota for trial as an illustration of a Poly-Kraft envelope allegedly produced by Central Bag and Supply Co. in 1964 (Tr. 39, 40–42). It is identical to P–275, also made by Mota for the trial (Tr. 532, 1293).

C–3 is a fold-over and end-loading envelope produced by the Richmond Corporation, bearing thereon U. S. Patent No. 3,070,280. One form utilizes Poly-Kraft material and the other form uses polyethylene (Tr. 44–45, 47–48).

C–4 is a sample of an envelope manufactured by Visual King Corporation. It is an open-end type made of folded tubular polyethylene, heat-sealed on two sides. Pressure-sensitive adhesive does not extend over the entire area of its rear surface. Instead, it employs adhesive in strips, one of which is applied to the back panel about an eighth of an inch from the folded edge, and the other one of which is applied to the exposed rear surface of the front panel (Tr. 46–47, 52).

C–5 is an end-loading fold-over envelope, heat-sealed on three sides, employing pressure-sensitive adhesive and release paper. It was described in the Beskind patent specification (P–299; Tr. 62).

C–6 is a sample of the patented structure (Tr. 408–411).

During the course of trial, counsel stipulated and agreed to the following facts and/or conclusions of law:

"(a) There are no patentable distinctions between envelopes designated as C–1, C–2 and C–6, and for the purposes of this suit, each may be regarded as equivalent to the envelope claimed in the patent in suit (Tr. 38, 40, 188–191, 654, 868, 1293–1294)

(b) If the Court finds that Gurewitz manufactured and sold any one or more of a C–1 or C–2 prior to August 26, 1965, the patent in suit is invalid pursuant to 35 U.S.C. § 102(b) (Tr. 38, 40, 43, 188–191, 585–586).

(c) If the Court finds that Gurewitz, prior to August 26, 1965, sold the C–1 type of envelope which was adhesed by Presto Adhesives, the patent in suit is invalid pursuant to 35 U.S.C. § 102(b) (Tr. 1552–1555).

(d) The tubular form of envelopes produced by the patentee BESKIND in January-February 1964, as exemplified by Exhibits P–111, P–278 and P–231 are equivalent to the C–1 and C–6 envelopes from the patentable standpoint, there being no patentable distinctions there between (Tr. 644, 654).

(e) C–1 type envelopes as exemplified by Exhibits–P–111, P–278 and P–231 were sent to DENNISON by SPEEDMASTER on or about February 19, 1964 (Tr. 643)."

The split back envelope in suit has value in its use as a packing list envelope. The

split back envelope). Defendant Speedmaster counterclaimed against ADM for infringement of the patent and brought a third-party complaint against the Third-Party Defendants Armando D. Mota (hereinafter Mota) and Frederick C. Osborne (hereinafter Osborne), both residents of New Jersey, and officers and directors of ADM, charging them with infringement. An actual controversy exists between the parties and jurisdiction and venue exist under 28 U.S.C. § 1338(a) and the patent laws of the United States, 35 U.S.C. §§ 271, 281 and 285.

The Plaintiff ADM and the Third-Party Defendants Mota and Osborne have also charged the Defendant Speedmaster with malicious abuse of process for both charging them with infringement of the patent in suit and for asserting it against them in the marketplace with knowledge that the patent was invalid, and seek counsel fees herein as damages therefor. Plaintiff and Third-Party Defendants have also charged Co-defendant Dennison Manufacturing Company, a Nevada corporation having its principal place of business in Framingham, Massachusetts (hereinafter Dennison), with malicious abuse of process for having charged them with infringement of the patent in suit previously in this action, and for asserting it against them in the marketplace knowing that the patent was invalid, seeking counsel fees as damages therefor, jointly and severally with Defendant Speedmaster.

Plaintiff and Third-Party Defendants have also charged the Co-defendant Dennison with breach of a certain Stipulation and Order entered herein on December 20, 1968 ordering Co-defendant Dennison, *inter alia,* to discontinue advertising that it had any exclusive rights under the patent in suit as a condition precedent to Plaintiff's voluntary dismissal of its complaint against Dennison for declaratory judgment of patent invalidity and non-infringement.[3] However, during trial, Plaintiff and Third-Party Defendants stipulated and agreed with Co-defendant Dennison, with the Court's consent, to dismiss their complaint for breach of the Stipulation and Order with prejudice and without costs for other liability to them.

The Co-defendant Dennison voluntarily rejoined this action on September 14, 1970, after having entered into an exclusive patent license with Speedmaster on August 7, 1969, charging Plaintiff with infringement of the patent in suit; nevertheless, in November 1971, Dennison substituted its exclusive license for a non-exclusive license and on May 16, 1972, Dennison, by its own motion, voluntarily dismissed its counterclaim against Plaintiff ADM and its Third-Party complaint against Mota and Osborne with prejudice and without costs.

packing list envelope is employed to transmit an invoice or some other document along with the goods to be shipped. Utilization of the envelope is accomplished by several simple manual actions. Insertion is accomplished by pushing the invoice or document through a slit in the back wall of the envelope. The loaded envelope is then affixed to the accompanying carton or parcel by removing the release paper located on the back wall, exposing an adhesed surface, which is then placed on the carton or parcel. Thus affixed, the packing slip envelope parasitically accompanies the carton throughout its travel, safely affixed and lying perfectly flat with the surface of the carton.

The walls of the packing list envelope in suit can be composed of either opaque or translucent material. If the envelope is made of translucent material, it can double as a shipping label, in that an address label can also be inserted into the envelope along with the invoice. The window of the packing list envelope permits the address label to be readable by persons transporting the package.

3. ADM's predecessor initiated this action against Dennison and the patentee Beskind for declaratory judgment of invalidity and non-infringement growing out of threats of infringement directed to it and its customers. Dennison denied having an exclusive license and moved to dismiss; Beskind moved to dismiss for lack of jurisdiction of the person. The issue was settled by the said Stipulation and Order, Beskind submitting to the jurisdiction of this Court. Later, Speedmaster was substituted for Beskind as the assignee of the patent in suit.

The Plaintiff ADM has also charged both of the Defendants, Speedmaster and Dennison, with violation of the anti-trust laws of the United States. However, trial on this complaint has been reserved for a later date. Additionally, the Co-defendant Dennison has charged Plaintiff and Third-Party Defendants with unfair competition based upon the Plaintiff and Third-Party Defendants having charged the Co-defendant Dennison with malicious abuse of process and anti-trust violations as hereinabove set forth. This matter has also been reserved for trial at a later date.

The controversy which was brought to trial is solely that of patent validity and infringement and the related counts of malicious abuse of process. ADM asserts three distinct theories which assail the validity of the patent in suit. They are: (1) the claims of the patent are invalid pursuant to 35 U.S.C. § 102 by reason of prior invention of Richard Gurewitz; (2) the claims of the patent are invalid pursuant to 35 U.S.C. § 102 by reason of offers of sale of envelopes identical to the patent to Dennison more than one year before the filing of the application for the patent; and (3) the claims of the patent are invalid pursuant to 35 U.S.C. § 103 because the subject matter was obvious to one skilled in the art.

The first line of attack on the Beskind patent is three-pronged, alleging that the patent in suit is invalid because of anticipation under 35 U.S.C. § 102(a), (b) and (g).

These claims are predicated upon the testimony of Richard Gurewitz, a former employee of Central Bag and Supply Co. of Los Angeles, California (hereinafter Central Bag), and the deposition of Manley R. Spina, a present employee of that firm, to the effect that they manufactured and sold C–1 and C–2 type bags more than one year before Beskind first applied for his patent on August 26, 1966, and that they manufactured and sold these bags in late 1964 and early 1965, before Beskind claims to have invented his bag (C–6).

It had been stipulated at trial between the parties that the C–1 and C–2 type envelopes are without patentable distinction from the C–6 envelope (a model of the patent in suit) and that if the testimony of Gurewitz were in fact believed, the Beskind invention, C–6, would be anticipated (Tr. 1293–1294; 1394; 1554–1555).

Title 35 U.S.C. Section 102 provides:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country * * *, before the invention thereof by the applicant for patent . . . or

. . . . . .

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it

. . .

ADM claims that inasmuch as Central Bag developed and sold its C–1 and C–2 bags in 1964 and 1965, and that "shortly before March 22, 1965," is the earliest date that Beskind claims to have first invented his C–6 bag, and that inasmuch as there is no patentable distinction between any of these bags, the Beskind patent was invalid for anticipation under subsections (a) and (g) of 35 U.S.C. § 102.

35 U.S.C. § 102(b) prohibits the issuance of a patent when "the invention was * * * in public use or on sale in this country, more than one year prior to the date of application for [the] patent."

The Beskind patent application was dated August 26, 1966. ADM claims that inasmuch as Central Bag's C–1 and C–2 envelopes were in both public use and sale by September of 1964, in the case of C–2, and June of 1965 in the case of C–1, that these bags anticipated the patent application by more than one year and the patent which issued is therefore invalid under 102(b).

Thus, if Gurewitz and Spina are believed there is anticipation under

102(a), 102(b) and 102(g) (Tr. 1552–1554).

There is, of course, a presumption of validity in favor of a patent, lawful on its face, issued by the Patent Office. 35 U.S.C. § 282. In the face of this statutory presumption, courts have placed a heavy burden on those who seek to demonstrate invalidity. Some courts have stated that " . . . invalidity must be demonstrated by clear and convincing proof [citing cases]," Trio Process Corporation v. L. Goldstein's Sons, Inc., 461 F.2d 66, 70 (3rd Cir. 1972), while at other times the burden has to be stated in terms beyond mere "clear and convincing" evidence, and has been held to require the proof to be "beyond a reasonable doubt": "the defense of prior use is one that an alleged infringer, although free to raise, has the burden of persuasion. This burden is a heavy one, having been described by this Court as necessitating evidence that 'must be so strong as to remove all reasonable doubt thereof.' [citing cases]." Jones Knitting Corporation v. Morgan, 361 F.2d 451, 455 (3rd Cir. 1966).[4]

ADM claims to have met its heavy burden through the testimony of Gurewitz, as corroborated by the Spina deposition as to the prior development, use and sale of the C–1 and C–2 type bags by Central Bag. ADM points to the fact that there was no contradictory testimony to theirs offered at the trial, and that these witnesses, that is, Gurewitz and Spina, who have never met or known anyone in interest in this lawsuit, have no motive to lie and, since uncontradicted, must be believed.

■ The Court disagrees. The mere fact that one testifies to a prior "public use" of a patented item, and that no witness is thereafter called to contradict his testimony, does not in and of itself require the Court to believe him. Jones Knitting Corporation v. Morgan, *supra*. On the contrary, no matter what burden of proof the Court applies, whether "clear and convincing" or "beyond a reasonable doubt," the cases are legion in requiring courts to closely scrutinize oral testimony of such "prior use" when the oral testimony is uncorroborated by documents, or by such objective circumstances as would corroborate the claim:

. . . The fact that plaintiffs seek to carry their burden [of prior public use] solely on the basis of oral testimony is not necessarily fatal to their case. However, because of the nature of this testimony, this court is under a duty to scrutinize it very carefully.

. . .

Jones Knitting Corporation v. Morgan, *supra*, p. 455[5].

(Defendant Speedmaster's Post-Trial Brief at p. 13)

---

4. ADM claims the burden to be clear and convincing proof:
   In order to invalidate a patent under 102, it is necessary that the testimony be clear, convincing and corroborated.
   (ADM proposed finding of fact 105).
   Speedmaster contends the burden to be "beyond a reasonable doubt":
   One otherwise an infringer who assails the validity of a patent fair upon its face bears a heavy burden of persuasion and fails unless his evidence has more than a dubious preponderance. Radio Corporation of America v. Process Engineering Laboratories, Inc., 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163 (1934); Trio Process Corporation v. L. Goldstein's Sons, Inc., 461 F.2d 66, 70 (3rd Cir. 1972); Jones Knitting Corporation v. Morgan, 361 F.2d 451 (3rd Cir. 1966); Anchor Plastics Co., Inc. v. Dynex Industrial Plastic Corp., 363 F.Supp. 582 (D.N.J.1973).

5. The courts have utilized various descriptions to identify the burden of proof necessary to establish prior use as an anticipation of a patent. A patent regularly issued is presumed to be valid until the presumption has been overcome by convincing evidence of error. Sometimes it is said that in a suit for infringement, when the defense is a prior invention, the burden to make good this defense is upon the party setting it up and every reasonable doubt should be resolved against him. Cantrell v. Wallick, 117 U.S. 689, 695–696, 6 S.Ct. 970, 29 L.Ed. 1017 (1885); Coffin v. Ogden, 85 U.S. (18 Wall.) 120, 124, 21 L.Ed. 821 (1873); The Barbed Wire Patent, 143 U.S. 275, 285, 12 S.Ct. 443, 36 L.Ed. 154 (1891). Evidence of a clear and convincing nature has been sufficient to invalidate a patent on the grounds

■ Applying the standard of clear and convincing evidence to the trial testimony of Gurewitz and the deposition of Spina, the Court is totally unpersuaded that they in fact developed and sold the bags they claim to have developed and sold in September of 1964 and June of 1965. Indeed, were the burden to be reduced to proof by a mere preponderance of the evidence, the Court would still not invalidate the patent in suit on the basis of the testimony offered by the witnesses.

In substance, Gurewitz testified that for many years, until April of 1972, he was employed by Central Bag (Tr. 1271). The firm itself was and still is wholly owned by his two uncles, the Shulkers (Tr. 1314), and Gurewitz was employed by them as both Production Manager and Sales Manager for Central Bag (Tr. 1272).

In April of 1972 Gurewitz left Central Bag and established his own firm, Poly Pak America, in Los Angeles (Tr. 1271). Although the two firms, Poly Pak America and Central Bag, are separate, there is a close business relationship. They buy and sell from and to each other, and Poly Pak America distributes some of Central's bags, particularly a Sanford type bag (P–268) (Tr. 1395–1396).

It was Gurewitz's testimony that he created the C–2 type bag (P–275) in approximately September of 1964, and that he is able to fix the time by a sample of polycraft, with adhesive on its back (P–246), which he obtained from a firm called Fasson on November 10, 1964 (Tr. 1279). He is able to fix the date of his creation as September of 1964 because it was a "couple of months" before he received this sample (Tr. 1281).

He testified that he produced hundreds of thousands of these C–2 type envelopes and that he sold 25,000 of them commercially, the remainder having been sold as distressed merchandise (Tr. 1347):

Q. Go ahead and explain that.

A. We sold these envelopes down in Mexico or as distressed merchandise. We did have orders for these envelopes. We tried to sell them. And

---

of anticipation. Smith v. Hall, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049 (1936); A. J. Industries, Inc. v. Dayton Steel Foundry Co., 394 F.2d 357, 361 (6th Cir. 1968); Rooted Hair, Inc. v. Ideal Toy Corp., 329 F.2d 761, 765 (2nd Cir. 1964), cert. denied 379 U.S. 831, 85 S.Ct. 63, 13 L.Ed.2d 40 (1964); Whiteman v. Mathews, 216 F.2d 712, 716 (9th Cir. 1954).
Although there has been documentary evidence to corroborate oral testimony in practically all the cases in which prior public use has been held to invalidate a patent, there is no absolute requirement of such corroborative evidence. Anderson Company v. Trico Products Corp., 2 Cir., 267 F.2d 700.

Yet, the *Anderson* court, on rehearing, reversed the trial court's finding of patent invalidity under § 102(b) on the ground that the only evidence of prior use was oral testimony and that testimony was by no means abundant.
Stress on the disinterestedness of the witness and lack of impeaching evidence or some documentary evidence appears to elicit the clear and convincing standard. A. J. Industries v. Dayton Steel Foundry Company, *supra*; Whiteman v. Mathews, *supra*; Smith v. Hall, *supra*; Eibel Co. v. Paper Co., 261 U.S. 45, 60, 43 S.Ct. 322, 67 L.Ed. 523 (1923). However, oral testimony of the inventor alone has been declared insufficient to establish prior use. Smith v. Hall, *supra.* The Seventh Circuit, while stating that the burden of proof for establishment of a public use was to be clear and convincing, noted that where the finding of a public use was to be based solely on oral testimony, the courts have demanded a higher degree of proof. It declined to impose the criminal law rule of beyond a reasonable doubt for fear of adding to the already-existing confusion in this area. Julian v. Dryling Systems Co., 346 F.2d 336, 338 (7th Cir. 1965).
Deller's Walker on Patents, § 81 (perm. ed. 1964), lists over 23 different phrases that courts have employed in defining the burden of proof required in establishing anticipation or prior use. These range from "beyond a reasonable doubt" to "evidence must have more than a dubious preponderance." Perhaps the most typical is "no hard and fast rule."
The modern trend appears to be to use "clear and convincing" as the standard, and to increase the burden if the oral testimony employed to establish the prior use is not corroborated to the satisfaction of the court.

most of them—the greater portion of them were not good. We did have orders for these. The very little bit that were good we did sell to the people who gave us the orders.

Q. How many did you produce, sir?

A. Good ones in that one? If it was 25,000 I think it was a lot.

Q. How many bad ones did you produce?

A. Hundreds of thousands.

Q. You kept on producing them?

A. We kept on looking for changes. Hundreds of thousands in poly bags is not a particularly large amount, sir.

Q. How much did you charge for the good ones?

A. Maybe $10.

Q. How did you arrange for these buyers for the bad ones?

A. Well, usually you let the people know. They come and give you a bid on it.

His testimony was that although he actually sold 25,000 good C–2's (P–275), and kept producing others, he has no recollection as to whom he sold them to:

Q. I show you what has been previously marked as plaintiff's Exhibit 275 in evidence and ask you to describe your first Poly-Kraft bag as it relates to P–275?

A. It's very similar, almost exact. Maybe we were a little more on the seal here, but that's all. Ours was not quite as nice.

(Tr. 1275)

\* \* \* \* \* \*

Q. Now, what did you do, if anything, with respect to disposition of envelopes of the character of P–275?

A. What did we do with them?

THE COURT: Did you sell them?

THE WITNESS: Yes.

THE COURT: Who did you sell them to?

THE WITNESS: We sold them to —they weren't too good, so we sold them to jobbers who would either take distress merchandise or we would sell them down to Mexico. I really don't recall.

But it was our history, and the owner of the company just would not throw away anything, we would try to sell it for scrap of some kind.

Q. Did you offer envelopes of the character of C–275 [sic] in evidence to anybody for sale?

A. Well, when we originally—the hand samples were made to show and to sell this product and which we actually took orders. We were really never able to fulfill them.

(Tr. 1276–1277)

\* \* \* \* \* \*

Gurewitz testified that he has no recollection of what caused him to create the C–2 type bag in 1974 (Tr. 1387–1388), and that, in spite of having produced "hundreds of thousands" of C–2's, he had no production records reflecting their manufacture (Tr. 1313, 1315, 1420–1423), and no records of sales of the 25,000 "good" bags, or recollection of whom he sold them to (Tr. 1353–1354, 1360–1361); or indeed, any records reflecting the sale of the distressed C–2's to the Mexicans (Tr. 1399–1401). He finally offered the thought that there were no such records because these C–2's were sold for cash, and were not reported on the books of Central Bag (Tr. 1347–1350). He was not able to explain why there were no records as to the sale of the good C–2's. The following is illustrative:

THE COURT: What is perplexing me, Mr. Gurewitz, is, as I understand it, yesterday you explained to us that the C–2 type envelope in respect to those that were defective or distressed goods sold to Mexican or other such type purchasers for cash, no records exist because it may well be some people at the firm were not putting the cash into the firm and were keeping the money.

THE WITNESS: Yes.

THE COURT: Do you have any explanation as to why in respect to the GC-2 [sic] type envelopes which were furnished pursuant to order there are absolutely no records of any such sales at Central Bag?

THE WITNESS: There would be sales. You asked me in regard to purchases, is . that correct? In other words, he's asking about purchase orders.

THE COURT: I asked you a few minutes ago whether or not you told us yesterday that there are no records in Central Bag reflecting any sales, in Central Bag any sales of any C-2 type envelopes.

THE WITNESS: I don't remember saying that, Judge.

THE COURT: Are there any such records?

THE WITNESS: Yes, there would be records of sales if we had sold to a legitimate company.

THE COURT: Did you sell it to a legitimate company?

THE WITNESS: Yes.

THE COURT: Are there such records of sales?

THE WITNESS: Are there now. I couldn't find any.

THE COURT: That's what I am asking you.

THE WITNESS: But it's been a long time.

THE COURT: Well, when did you first look for them?

THE WITNESS: 1972.

THE COURT: Two years ago?

THE WITNESS: Yes.

THE COURT: Were there any records then?

THE WITNESS: Of the 1964 envelopes? No.

THE COURT: Well, did you make them in 1965?

THE WITNESS: Or 1965. No, I couldn't find any.

THE COURT: Did you make them in 1966?

THE WITNESS: The C-2, no.

THE COURT: But you made C-1's?

THE WITNESS: C-1.

THE COURT: That was a progression of C-2?

THE WITNESS: That's correct.

THE COURT: Did you find any records of any sales of C-1 for 1966?

THE WITNESS: No.

THE COURT: For 1967?

THE WITNESS: 1967 I didn't look. I didn't look for 1966 either. (Tr. 1399-1401)

Finally, Gurewitz testified that he was only assuming there were any sales of C-2 bags to the Mexican buyers about whom he had testified so extensively:

Q. Who did you let know?

A. You let the word out in town and the Mexicans come by periodically. You show them the envelopes. If they can use it, they'll tell you what they'll give you for it.

Q. Would they pay you by cash or check?

A. Cash. The Mexicans are by cash. The people who buy the defective merchandise sometimes check, sometimes cash.

Q. When they paid you by cash, did you make an entry in your general ledger?

A. First of all, I didn't receive the cash, myself.

Q. Who was in charge of selling these?

A. I was in charge of selling them but the money would go to the owners, which would be Leo and Harry Schlooker. [sic]

Q. Were they present when you sold it?

A. They weren't. I turned the money in.

Q. It would go to you?

A. If the money would come to me. Whoever it went to, sir.

Q. How much money would you get on a typical sale to the Mexicans?

A. Couple of hundred dollars. $500. Depends on how many were there.

Q. You would just turn it over to one of your uncles?

A. Yes. If I sold them.

\*  \*  \*  \*  \*  \*

Q. What would you do when somebody gave you a check after you sold them?

A. I'd still turn it in to my uncles.

\*  \*  \*  \*  \*  \*

THE COURT: I was asking you when you sold the C–1 or C–2 type envelopes to Mexicans, defective or distressed products, what you would get for them. Did you understand that?

THE WITNESS: What I would get for them.

THE COURT: What did you get for them. What do you mean what you would get?

THE WITNESS: That's what I think you said. You said what would you get for them.

THE COURT: What do you understand that to mean?

THE WITNESS: It means if I sold them, how much do you think I would get for them.

THE COURT: I'm going to ask you a very pointed question. Did you sell any?

THE WITNESS: I don't remember.

THE COURT: You have no recollection you say of selling any of these distressed C–1 or C–2 types to any Mexicans, is that it?

THE WITNESS: No, right. I do not remember.

\*  \*  \*  \*  \*  \*

THE COURT: All right. So that we are clear, then, you understand, Mr. Gurewitz, I'm going to have to make findings of fact when this trial is over.

THE WITNESS: I understand.

THE COURT: I want to understand precisely what you testified to.

THE WITNESS: Okay.

THE COURT: It is my understanding from you, Mr. Gurewitz, that any testimony you have given about sales to the Mexicans has been a complete total assumption on your part.

THE WITNESS: Yes.

THE COURT: You have no specific recollection of selling any C–1 or C–2 envelopes to any Mexicans?

THE WITNESS: That's correct. (Tr. 1348–1356)

Gurewitz then testified to the creation of the C–1 envelope, which he had described as a natural progression from the C–2. He estimated that he began manufacturing C–1's in April of 1965 (Tr. 1306), and that by June of 1965 he had solved some manufacturing problems (Tr. 1308) so that by June of 1965 he was producing and selling C–1's (Tr. 1309–1311).

He was unable to account for how he had come to create the C–1 bag, just as he had been unable to account for his design of the C–2 bag:

THE COURT: Do you have any recollection of the circumstances that led you to make the first C–2 type bag?

THE WITNESS: Most probably heavy requests from the people I do business with.

THE COURT: Do you have any specific recollection of the circumstances that led up to your making the first C–2 type bag? By that I mean, do you have any present recollection of who in particular asked you to make it or the circumstances of the request? I'm not interested now in probabilities.

THE WITNESS: No.

THE COURT: I'm interested in any recollection.

THE WITNESS: I can't do that. No recollection.

THE COURT: Do you have any recollection, present recollection, of any specific request from a specific customer or distributor which led you to make the first C–1 type bag?

THE WITNESS: C–1 is the—

THE COURT: Show him the—

THE WITNESS: Let's put it this way. Doesn't make any difference.

THE COURT: Wait until you see the bag.

MR. FOLEY: C–1 is the top.

THE WITNESS: The C–1 is already in progression. In other words, we now know that people want our bag. Whether it was—they wanted a packing list envelope.

THE COURT: Who created the C–1 in your organization?

THE WITNESS: The C–1—came by evolution, quite frankly, because we were making this so-called C–2. It proceeded into the C–1. There—we were selling this product. People wanted it and we had to come up with the product to be—the proper product to come up to sell it on a mass basis. (Tr. 1387–1388)

He was unable to produce a single document reflecting the production or the sale of the C–1 or C–2 (Tr. 1313, 1314, 1315), any records of the purchase of supplies to make either envelope (Tr. 1415–1418), or any specific recollection of any sale of either envelope to any specific customer at any specific time for any specific amount. (Tr. 1350–1356). His testimony concerning the production and sale of C–1 type bags was as elusive as his testimony about the C–2:

Q. How do you recall then that you ever sold a C–1?

A. Well, we were making the envelopes and we were—they were for general purposes. They were good envelopes and we sold them.

THE COURT: How much by volume? I want the total number of volume.

THE WITNESS: I have no idea of what the total volume would be.

THE COURT: Let me finish the question. Then you may be able to come up with an answer.

I want to know the total number by volume, your best estimate, of how many C–2 and C–1 type envelopes you sold as production manager and sales manager of Central Bag between the years 1964 and the end of 1966.

THE WITNESS: Well, if—on the C–2 I would say 25,000 would be a whole lot of bags on the C–2.

THE COURT: Does that include distressed bags?

THE WITNESS: No.

THE COURT: I want to know the total number of C–2 bags, your best estimate, that you sold?

THE WITNESS: Maybe a couple hundred thousand.

THE COURT: I want to know the total number of C–1 bags.

THE WITNESS: C–1 we were selling fairly well.

\*      \*      \*      \*      \*      \*

THE WITNESS: Offhand, I would say at least two, 300,000. The machine put out fairly well. Although we had problems with it, but I would say two or 300,000. It wasn't a whole heck of a lot. It wasn't a whole heck of a lot.

THE COURT: Do I understand you correctly that you don't have any records available to you of any sales, any orders or any supplies purchased by Central Bag in connection with your purchase, sale or manufacture of these C–2 type envelopes or C–1 type envelopes?

THE WITNESS: No. On the C–1 —I don't have any back there. But, you know, even on C–1, you know, that's—on the C–1 I think it is an unfair question because I really don't recall how many we sold and the number even being, say, large to you is relatively small. (Tr. 1420–1422)

ADM has repeatedly pointed the fact that neither Gurewitz nor Central Bag has any connection with ADM, or its officers, and therefore no motive either to dissemble deliberately or to stretch the truth inadvertently. The record demonstrates otherwise.

Gurewitz testified that he regarded the Beskind envelope (C–6) as not patentable, and one which "stifles competition" in the industry in which he and his uncles operate (Tr. 1327–1328).[6] He further testified that the patented envelope in suit (C–6) is so close to the envelope made and sold by his uncles at Central Bag (P–268, a Sanford type), as to be "virtually the same thing" (Tr. 1329–1331, 1332, 1395–1396). Gurewitz sells and distributes these envelopes through Poly Pak America (Tr. 1395–

1396). He is hardly the disinterested witness ADM would have him be. So too with Spina, the employee of Central Bag, who, in his deposition, testified that he understood that his testimony would help his employer, Central Bag.[7] It is true, as ADM alleges, that the testimony of Gurewitz is corroborated by the deposition of Spina.[8] But Spina's deposition lends nothing to the testimony of Gurewitz. While it is true that Spina tells a similar story, Spina's testimony is as vague, unprecise and uncorroborated as is Gurewitz's.[9]

ADM repeatedly asserts that the Court must accept the Gurewitz testimony and the Spina deposition, unless the Court makes an actual finding that these men committed perjury.[10]

---

6. Q. What interest did you have to persuade Mr. Spina and Mr. McDougal to attend this meeting with Mr. Bain?
A. What interest I had?
Q. Yes.
A. Well, one is that I—let's put it this way: I asked them to attend because, one, I don't think this is the—well, this is my own opinion. *I don't think it's a patented product*, and *in my opinion I think it stifles competition.* I don't·think that product should be—
I think that all the evidence that should be brought forward to see whether it really is patentable or not.
(Tr. 1327–1328; Emphasis added)

7. THE WITNESS: Could I say that *I think I am helping Central Bag by giving this deposition.* . . .
Q. Do you think the Shulkers would approve of your being here testifying?
A. I imagine they would, yes.
(Spina Dep., p. 41) (Emphasis added)

8. Spina, who works and resides in California, and who is thus beyond the jurisdiction of the Court, refused to appear and testify (Tr. 1270). This, of course, permits no adverse inference and the Court has given full consideration to his deposition. Cf., Wright Root Beer Co. of New Orleans v. Dr. Pepper Co., 414 F.2d 887 (5th Cir. 1969).

9. ADM has also submitted the deposition of Murray McDougal, a former employee of Presto Adhesive Paper Company. McDougal's testimony indicates that he collaborated with Central Bag in the application of adhesive to polyethylene tubing, however, no mention is made of the specific type of

product that resulted from the adhesed polyethylene. We cannot accept the McDougal deposition as corroborative of Gurewitz's purported construction of the patented envelope in suit, or any other envelope for that matter.

10. See, for example, ADM Post-Trial Brief in response at p. 33:
Defendant submits that the Court should summarily reject the testimony of GUREWITZ notwithstanding corroboration by SPINA with respect to the date of conception and reduction to practice of the C–2 envelope in September, 1964. (Defendant's Brief pages 31–43). To do so, the Court would have to find that both SPINA and GUREWITZ gratuitously perjured themselves because neither of their detailed testimonies admits of a conclusion that they were somehow 'mistaken'. Defendant offers no contradictory or impeaching testimony but rather only massive speculation.
\* \* \* \* \*
and at pp. 36–37:
The Court cannot engage in unsupported speculation. Trials are determined upon testimony and other evidence. Either GUREWITZ made a C–2 envelope or he is lying altogether as is SPINA. Both GUREWITZ and SPINA knew the difference between a C–2 and a C–5 envelope. There can be no room for the claim of 'mistake'. Defendant has offered no evidence to contradict GUREWITZ or SPINA, it has offered no evidence of bias or even attempted to contradict Plaintiff's evidence of lack of bias. Defendant has offered no evidence of motive for perjury.

ADM misperceives the law. It is not the burden of one who holds a patent to prove that a claimed prior inventor is lying, nor is the Court required to find, as a matter of fact, that he is perjurious before it can sustain the patent against such a claim of anticipation. The burden is the other way around. The burden here is on ADM to prove, by clear and convincing evidence, that Gurewitz did in fact anticipate Beskind.[11] The Court may find, as it does find, that Gurewitz's testimony, with its inconsistencies and assumptions, is not clear, and, as uncorroborated by any reliable records or trustworthy objective evidence, is simply not convincing. The further fact is that the testimony as a whole, both as to its content and the manner in which it was delivered, is totally unpersuasive. The Court, in rejecting it, need not find it perjurious as well.[12]

ADM mounts a second line of attack on the patent in suit, alleging anticipation under 35 U.S.C. § 102(b) predicated

---

Last, but most damaging, Defendant has undertaken no discovery to produce contradictory or impeaching testimony.

11. ADM makes much of the fact that defendant Speedmaster called no witnesses either to impeach the veracity of Gurewitz, or to demonstrate that Gurewitz did not in fact create and sell the patented envelope in suit before Beskind applied for his patent, or, for that matter, before Beskind himself conceived and reduced the invention. In the context of this case, this fact is without significance.

The Gurewitz oral testimony was supported only by the Spina oral deposition. It was buttressed by no records, and by no tangible exhibits of worth. The oral testimony itself was vague and imprecise as to the creation, manufacture and sale of the Central Bag's C–1 and C–2. It would have been most difficult for Speedmaster to rebut testimony, oral in nature, which basically amounted to no more than a bold claim of prior invention. When one testifies that he has, years before, himself invented the very thing thereafter patented by another, and relies only on the oral testimony of his own friends, relatives and colleagues, it is almost impossible to *disprove* his claim. It is or should be a relatively easy thing to establish the prior invention, manufacture and sale in quantity of a packing envelope clearly and convincingly. Speedmaster was under no obligation to disprove it. It was entitled to rely on the presumption of validity and the burden of proof under which the plaintiff labored. After hearing the testimony adduced, the Court cannot say that the defendant acted unreasonably.

12. As the Supreme Court, through Mr. Justice Brown, taught us many years ago:

We have now to deal with certain unpatented devices, claimed to be complete anticipations of this patent, the existence and use of which are proven *only by oral testimony*. In view of the *unsatisfactory character of such testimony*, arising from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury, courts have not only imposed upon defendants the burden of proving such devices, but have required that the proof shall be clear, satisfactory, and beyond a reasonable doubt. Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information. The very fact, which courts as well as the public have not failed to recognize, that almost every important patent, from the cotton gin of Whitney to the one under consideration, has been attacked by the testimony of witnesses who imagined they had made similar discoveries long before the patentee had claimed to have invented his device, has tended to throw a certain amount of discredit upon all that class of evidence, and to demand that it be subjected to the closest scrutiny.

The Barbed Wire Patent, 143 U.S. 275, 284–285, 12 S.Ct. 443, 447, 36 L.Ed. 154 (1892) (Emphasis added)

The Supreme Court reiterated the Barbed Wire doctrine with respect to oral evidence in Eibel Process Company v. Minnesota & Ontario Paper Company, 261 U.S. 45, 60, 43 S.Ct. 322, 327, 67 L.Ed. 523 (1923), where it stated:

The oral evidence on this point falls far short of being enough to overcome the presumption of novelty from the granting of patent. The temptation to remember in such cases and the ease with which honest witnesses can convince themselves after many years of having had a conception at the basis of a valuable patent, are well known in this branch of law, and have properly led to a rule that evidence to prove prior discovery must be clear and satisfactory. Barbed Wire Patent Case, 143 U.S. 275, 284, 12 S.Ct. 443, 36

upon the course of conduct of dealings between Speedmaster (Beskind) and Dennison. ADM alleges, first, that Beskind offered a C–1 envelope (by stipulation without patentable distinction from the patented C–6) for sale to Dennison more than one year prior to the date of his application for a patent (August 26, 1966), to wit, in February 1964 and again in June 1964. Additionally, ADM alleges that Beskind offered the C–6 envelope, the very thing patented, for sale to Dennison in the spring of 1965 (April-May-June), again more than one year prior to August 26, 1966, the date of the application for the patent.

To deal fully with the first claim of anticipation, it is necessary to detail the relationship between the parties.

Beskind organized Speedmaster in October of 1947. In 1958 or 1959 Dennison agents approached Beskind and requested him to try to produce a polyethylene packing slip envelope at a good price, one which would permit Dennison to sell it successfully on the commercial market.

Beskind testified that despite attempts on his part, he failed. However, in 1963 or 1964, government specifications on a G.S.A. (General Services Administration) bag were offered for a bid. Technical Tape, a competitior, then produced and marketed what for purposes of this suit has been termed a G. S.A. type bag, C–5. This is a polyethylene packing slip envelope, loaded at the end, which when adhered to the packing

---

L.Ed. 154; Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177.

In T. H. Symington Company v. National Malleable Castings Company et al., 250 U.S. 383, 386, 39 S.Ct. 542, 543, 63 L.Ed. 1045 (1919), the Supreme Court pointed out the suspicion with which oral testimony should be treated in the absence of physical documents in support thereof. There the court stated:

> This Court has pointed out that oral testimony tending to show prior invention as against existing letters patent is, in the absence of models, drawings or kindred evidence, open to grave suspicion; particularly if the testimony be taken after the lapse of years from the time of the alleged invention. Deering v. Winona Harvester Works, 155 U.S. 286, 300, 15 S.Ct. 118, 39 L.Ed. 153. And it has said: 'A conception of the mind is not an invention until represented in some physical form, and unsuccessful experiments or projects, abandoned by the inventor, are equally destitute of that character.' Clark Thread Co. v. Willimantic [Linen] Co., 140 U.S. 481, 489, 11 S.Ct. 846, 849, 35 L.Ed. 521.

In Deering v. Winona Harvester Works, 155 U.S. 286, 15 S.Ct. 118, 39 L.Ed. 153 (1894) the Court said:

> Granting the witnesses to be of the highest character, and never so conscientious in their desire to tell only the truth, the possibility of their being mistaken as to the exact device used, which, though bearing a general resemblance to the one patented, may differ from it in the very particular which makes it patentable, is such as to render oral testimony peculiarly untrustworthy; particularly so if the testi-

> mony be taken after the lapse of years from the time the alleged anticipating device was used. If there be added to this a personal bias, or an incentive to color the testimony in the interest of the party calling the witness, to say nothing of downright perjury, its value is, of course, still more seriously impaired. This case is an apt illustration of the wisdom of the rule requiring such anticipation to be proven by evidence so cogent as to leave no reasonable doubt in the mind of the court that the transaction occurred substantially as stated.

In Zachos v. Sherwin-Williams Co., 177 F.2d 762 (5th Cir. 1949), the Court found:

> Appellee, invoking the rule of the authorities, that proof of prior use must be beyond a reasonable doubt, and that without some authentic documentary support, mere oral evidence adduced to fix the date of the prior use will not suffice, and pointing to the evidence in this case and the findings of the trial court, insists that appellant has not sustained its burden, and the judgment of affirmance heretofore ordered suspended should now be put into effect.

> We agree with appellee. Despite appellant's contention to the contrary, we find no relaxation or modification of the rule of the cases establishing the requirements of proof when prior use is relied on to defeat the presumption arising from the grant of a patent. This rule is that prior use must be proved beyond a reasonable doubt, and that as a practical matter, it may be said that oral testimony alone, unsupported by writings, has not been, and will not be accepted as sufficient.

case, is fully adhered except for a small "flap". This flap is created when the end of the envelope is folded, after the packing slip is loaded, to encase fully the packing slip in the envelope. The unadhered flap protrudes from the surface to which the major portion of the envelope is otherwise freely adhered.

Beskind thereafter produced these C–5 envelopes for Dennison, and Dennison marketed them.

It was Beskind's testimony, which this Court finds to be fully credible, that near the end of 1964 Dennison asked Beskind to improve the design of these G. S..A. type bags (C–5's), because the unadhered flaps of these envelopes had generated numerous complaints from customers. This Court itself observed the manner in which these C–5 envelopes were affixed to the packing cases, and itself observed that the unadhered flaps of these packing list envelopes created a situation where the envelope itself could be pulled from the carton by contact with other objects or otherwise damaged during transit.[13]

It was Beskind's testimony that he regarded the assignment from Dennison to improve upon the C–5 to be a joint endeavor to create a better envelope, and that after several attempts, *which were unsuccessful,* he conceived the idea for the C–6 shortly before March 22, 1965. Thus, to protect his "invention," Beskind mailed himself a registered letter (P–17) containing a model of and instructions for the C–6 (P–16, P–17). This registered letter remained unopened until it was opened by counsel after this lawsuit was commenced.

ADM, on the other hand, points to one of Beskind's early attempts to create a packing list envelope to infer that more than one year before creating the C–6,

Beskind, in January of 1964, created the C–1 envelope. The C–1 envelope is a split-back polyethelyene packing slip envelope of tubular design. It is loaded from the rear, through a split back, and when the release paper attached to the rear is removed, the back is revealed to be fully coated with adhesive, permitting the envelope to be *fully* adhered to a package, without any protruding, unadhesed flap, which is the hallmark of the C–5.

On January 10, 1964, Beskind wrote to Dennison (P–83), and enclosed a sketch of his idea (P–178). The sketch depicts the C–1 envelope (Tr. 635–636). Dennison responded on February 7, 1964 requesting samples of the envelope described in Beskind's letter of January 10, 1964 (P–87). In response, Beskind, on February 19, 1964, sent a letter (P–84) enclosing a sample of the envelope (P–231). Simultaneously with sending Dennison a sample, Beskind sent himself a registered letter on February 19, 1964 (P–110), enclosing a letter, dated February 17, 1964 (P–112), and a handmade sample (P–111). It is agreed that the sample which Beskind sent himself (P–111) is identical to the sample he sent to Dennison (P–231), and that both are identical to the C–1 form which is without patentable distinction from the C–6 form for which a patent application was filed more than 18 months later.

The issue is whether, in February of 1964, more than a year before he filed his patent application, Beskind offered the C–1 form *for sale* to Dennison, and therefore, under 35 U.S.C. § 102(b), anticipated his own patent application more than one year later.

The question for decision turns on what kind of activity Section 102 contemplates as a "public use" or placing an

---

13. ADM, throughout the course of the litigation, hotly contested this. ADM constantly maintained there was no such infirmity in the C–5, and also denied that the C–6 patented envelope was an improvement over it. This Court has determined otherwise, based not only on its own observations of the two envelopes, and a common sense understanding of what happens to cartons and packages in transit, but also with recognition of the commercial success of the C–6, both at Dennison and ADM, over the C–5. Once the C–6 came into use, it outsold the C–5 by a margin of two-to-one. (Testimony of Spurgeon Condo [Tr. 1101]; D–52; D–53; testimony of Fred Osborne [Tr. 1155]).

article "on sale." Our Circuit has adopted the test enunciated by the Second Circuit in Metallizing Engineer Co. v. Kenyon Bearing & A. P. Co., 153 F.2d 516 (2nd Cir. 1946), cert. denied 328 U. S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946). See, U. S. Chemical Corp. v. Plastic Glass Corp., 243 F.2d 892 (3rd Cir. 1957), cert. denied 355 U.S. 836, 78 S.Ct. 59, 2 L.Ed.2d 47 (1957).

The *Metallizing* decision set forth an exception to the one-year bar of § 102(b) by allowing an inventor to practice his invention for his private purposes or his own enjoyment for more than one year and later to patent it. However, if he uses it to gain a competitive advantage over others and thus, in effect, attempts to extend the period of his monopoly, then the one-year limitation of § 102(b) applies. Later courts have interpreted this test to be whether the disclosure or demonstration activity has, as its main purpose, the generation of profit as opposed merely to further experimentation. In re Yarn Processing Patent Validity Litigation, 360 F.Supp. 74 (S.D.Fla.1973); Philco Corporation v. Admiral Corporation, 199 F.Supp. 797 (D.Del.1961).

■ The intention of the patentee, not the intention of the alleged prospective buyer, is considered determinative of whether the patented object was offered for competitive sale. *Philco, supra,* at 817.

■ If a patentee has exposed his invention to another party in a relationship that appears as part of a sales effort, he must establish the experimental exception by proof that the demonstration or disclosure was made in hopes of obtaining additional assistance to aid him with the continuing experimentation related solely to the patented features of the invention. In re Yarn Processing Validity Litigation, *supra,* 360 F.Supp. at 87; Kraftco Corporation v. Beatrice Foods, Co., 342 F.Supp. 1361 (D.N.J.1971); J. L. Clark Manufacturing Co. v. American Can Co., 256 F. Supp. 719 (D.N.J.1966).

In summary, the test is whether the use of the later patented invention is competitive on the one hand, or experimental on the other. Was the patentee soliciting orders, or advice?

■ Beskind testified that he regarded his efforts in January of 1964 as part of his continuing efforts to produce, not only for Dennison, but with Dennison, a packing list envelope. The letters of January 10, 1964 (P–83) and February 19, 1964, which he sent to Dennison, bear him out.[14]

14. The letter of January 10, 1964 (P–83):
Dear Fred:
I would like to bring you up to date on *our packing list development.*
We have finally located a good adhesive source and the sample enclosed will indicate the release paper and the sticking quality of the glue.
We propose a slightly different, and I think better and simpler bag construction. Next week I should have samples in clear poly of the construction.
Our bag does not have to be folded at the top to be completely sealed and water tight.
At present, we see no problem in supplying black opaque bags.
Costwise it is a little too early to be absolutely accurate, but we are under $20 per M and we feel the item might be substantially lower.
going to have to have orders for 200 M at a time. Is this possible?
Part of the problem will be on quantity.

To do this gluing economically, we are The construction sketch enclosed is to give some idea how this bag works.
Because we will have ¼" side seal, when you insert your packing list, remove the release paper and paste the envelope flat (without folding the top). You have a completely sealed package.
This makes the gluing and the bag making as simple as possible and no one else has a bag like it.
Kindest regards.
Very truly yours,
SPEEDMASTER PACKAGING CORP.
STANLEY J. BESKIND
(Emphasis added)
On February 7, 1964, F. E. Dickerman of Dennison wrote to Beskind stating that ". . . We are very anxious to get physical samples of the type of envelope you are proposing. . . ." In response thereto, Beskind responded to Dennison on February 19, 1964 (P–84)

The letters confirm that Dennison and Speedmaster had a joint, long-standing packing list envelope project. Beskind testified that in January and February of 1964 he did not write to Dennison to offer a final product for sale, but rather to advise Dennison of the progress of the project and to solicit Dennison's advice, and that he regarded these communications as completely confidential (Tr. 823–824).

He testified, convincingly, that he totally abandoned the C–1 concept because, in his opinion, it was impossible to produce this envelope on a mass production, commercial basis because it was impossible, other than with handmade samples produced under laboratory conditions, to adhese poly tubing to the edges.

A great deal of testimony was taken from John Questel, Armando Mota, Richard Gurewitz and Beskind, as to whether or not it is possible to mass produce or commercially sell the C–1

form. The issue is hotly contested between ADM and Speedmaster. It is not, however, necessary to resolve this issue in order to determine the question of anticipation here presented, because, after having heard all the evidence, this Court is convinced that Beskind, whether correctly or incorrectly, honestly believed in 1964, and still believes today, that it is not possible to mass produce and market the C–1 form, and never offered it for sale to Dennison.

Furthermore, it is absolutely clear that Beskind, because he did not believe the C–1 to be a good product, totally abandoned it, without ever having solicited, or accepted or filled even a single order. It was his testimony that he abandoned the C–1 form as unusable, and, once the Technical Tape C–5 form appeared, produced C–5's for Dennison, never having offered a C–1 for sale, nor having sold even one C–1 to Dennison.[15]

---

Dear Fred:

We finally have something positive on *the long standing packing list envelope project.*

The samples submitted could have been made with a stiffer kraft type release paper. They also could be printed black poly and obviously the size and gauge *could be altered to your requirements.*

Basically, we have a new and simpler idea here on construction. The bag is delivered sealed on all four sides. Our surface has a transverse slit through the poly and the release paper. The bag is filled through this opening. When filled the release paper is stripped off and the bag placed flat on any clear surface, adhesive down (not folded at the top). It is completely closed and waterproof. The construction is the least complicated and the cost of our manufacture as low as possible.

On the question of cost, most of the cost is in the gluing and interleaving of release paper. At present we have a cost on this operation which brings our total bag price to you around $10 to $20 per M (printed one color and in black poly).

We still have work to do with the gluing people on prices. I believe that in production we will learn enough to do this phase ourselves eventually or to lower their cost of 28¢ per M square inches

which is far under Kleenstick—but still very high.

Meanwhile, would you give me your peoples' reaction. Incidentally, I hardly think the Allied Converters bag will be available; those unfortunate people have financial and government fraud trouble according to the N.Y. Times the other day.

Very truly yours,
SPEEDMASTER PACKAGING CORPORATION
STANLEY J. BESKIND
(Emphasis added)

15. ADM, at trial, attempted to prove that Beskind in fact did offer the C–1 for sale, and gave quotes to Dennison on prices for the C–1.

ADM introduced a letter of January 15, 1964 from Dennison to Beskind, asking for quotations on envelopes (P–177), and Beskind's reply of June 30, 1964 (P–100). ADM claims Beskind's reply refers to C–1's. Beskind, while admitting that the quotes in P–100 are an offer, testified that it refers only to C–5 envelopes (Tr. 663–666), the first two being tuck style and the latter three being envelopes delineated in existing government specifications.

This Court, having heard Beskind's testimony, finds it to be credible. Moreover, the language of the letter from Dickerman to

Thus, while it is of course true, as Beskind did testify, that his experiments with the C–1, indeed, his experiments with other forms of envelopes, were all done in the *ultimate* hope of selling a final product to Dennison, this Court finds from clear and convincing evidence that Beskind never considered the C–1 to be beyond the experimental stage, never offered it to Dennison for sale, never sought to capture any customer for it, nor sought any competitive advantage from it, and himself abandoned it as useless.

As the court stated in Philco Corp. v. Admiral Corp., 199 F.Supp. 797, 817–818, in holding that there was anticipation:

> *In any case, the Court believes that it is the intent of the patentee or inventor rather than the tentativeness of the prospective buyer which is the key.*
>
> \*   \*   \*   \*   \*   \*
>
> The words 'on sale' themselves imply that the intent of the inventor is the critical factor. It is a question of fact to be determined upon all the evidence and in light of all circumstances in the case. The words 'on sale' themselves are not so complex as to compel overly-refined distinctions which ignore the infinite variety of commercial practices. In this case, it is clear [that] Philco was trying to sell its *new line* to Firestone. [It] was a

competitive use. As such, a failure to invalidate the '134 and '577 patents, assuming they are otherwise valid, would lead to an unwarranted extension of the patent monopoly.

(Emphasis added)

Inasmuch as it is clear that Beskind did not intend to sell C–1's, had no new envelope line, and was still trying, through experimentation, to find a new line when he abandoned his search in 1964 and went into the production of the C–5 envelope, there is no anticipation of his later C–6 by virtue of his earlier experiment with the C–1.

■ ADM's second claim of anticipation focuses on the time when Beskind first offered the patented envelope (C–6) for sale to Dennison.

ADM claims that this occurred "in the spring" of 1965, when Beskind allegedly offered it for sale to Dennison's Merchandise Manager of its Resale Division, David Keir, and that, inasmuch as this occurred more than one year prior to the patent application of August 26, 1966, this amounts to anticipation under 35 U.S.C. § 102(b).

As noted, this Court finds that Beskind created his C–6 envelope in March of 1965. If, as alleged by ADM, he did in fact offer this C–6 envelope for sale to Dennison prior to August 26, 1965, then he would have improperly anticipated his own patent.

---

Beskind, asking for the quotes, corroborates Beskind:

> The first item would be 500 M size 6⁹⁄₁₆″ x 4″, style of the *Tuck* envelope, and also if you could supply it with a slit backing, printed 'INVOICE ENCLOSED'.
>
> The second item would be 500 M size 7″ x 4¾″, also *same style* as the *Tuck* poly envelope and also with a slit backing, printed 'PACKING LIST ENCLOSED'. This item is designed to compete with our present parafined kraft packing list envelope market, and with the Tuck product.
>
> A third item would be 500 M size 8½″ x 3¾″ in a style *to meet government specifications* which you have in your office. This is to be printed 'PACKING LIST ENCLOSED'.

> A fourth item would be 500 M size 7″ x 4'¾″ [sic], again to meet *government specs* and to be printed 'PACKING LIST ENCLOSED'.
>
> There would be a fifth item size 9½″ x 8″, to meet *government specifications* and to be printed 'PACKING LIST ENCLOSED'.

(Emphasis added)

The deposition of Dickerman, which is rather unclear, focuses on the words "slit backing" in the second paragraph, and suggests that this refers to Beskind's new C–1 model. This testimony is neither clear nor definite. Moreover, it is unlikely that this, which would amount to a first solicitation on an entirely new line, is the manner in which Dennison would have ushered in the new envelope. (See also Tr. 955–956)

David Keir testified at the trial that some time "in the spring" of 1965 Beskind offered the C–6 envelope for sale to Dennison, through him (Tr. 891). He testified that Beskind had a hand-made sample and a sketch of the C–6 which Beskind showed to Keir. Keir testified that Beskind thought his idea was patentable and requested that Dennison pursue a patent on it, and that Beskind would, in return, take an exclusive manufacturing agreement from Dennison (Tr. 891, 895).

Keir's testimony was not persuasive. His recollection as to these occurrences was vague and uncertain. Moreover, it developed that he had left Dennison's employ, under circumstances which indicated a lack of amicability (Tr. 909), and that he was, at the time of his testimony, a representative of ADM, selling its products. Moreover, his testimony was persuasively contradicted by Beskind, whose testimony was itself corroborated by documents. Keir's testimony, on other points, was also contradicted by Spurgeon Condo, who this Court found to be a highly credible witness.

Beskind testified that, while there were discussions about the possible creation of envelopes in August of 1965, the first sample of the C–6 envelope which he ever gave to Dennison was not, as Keir testified, in the spring of 1965, or even in August of 1965, but as an enclosure to Beskind's letter to Dennison on September 17, 1965 (P–45). (Tr. 1009–1010). This letter, which begins, "Here enclosed are *the first* few samples . . . ." (Emphasis added), confirms Beskind's testimony and thoroughly undermines Keir's. Moreover, D–14, a letter from Keir to Dennison's Legal Department referring the C–6 idea for patent protection, is dated January 17, 1966. It is extremely unlikely that, as an employee of Dennison, Keir would have waited until that date to forward the idea if he had in fact received it from Beskind in August of 1965, much less earlier, in the spring, as he claims.[16]

This Court finds the testimony of Beskind credible and corroborated and that he did not do more than discuss inchoate ideas with Dennison in August 1965, and did not offer the C–6 for sale in that month, or earlier. Following the transmission of the first samples of the C–6 by Beskind to Dennison in *September* of 1965 (P–45), Beskind gave his first quotation of prices on the C–6 to Dennison on October 4, 1965 (P–46). The first order for the C–6 was placed by Dennison on November 3, 1965 (Tr. 930–932), and the first delivery was in January of 1966 (Tr. 1011; P–132, P–133).

Inasmuch as the credible evidence reveals that the first actual offer for sale occurred, at the earliest, in September of 1965, this Court finds that Beskind did not offer the C–6 for sale or put it in public use more than one year before he applied for his patent and that there is no anticipation under 35 U.S.C. § 102(b).

ADM's most substantial attack is its allegation that the claims of the patent in suit are invalid pursuant to 35 U.S.C. § 103, because the subject matter was obvious to one skilled in the art and therefore not patentable.

16. THE COURT: Mr. Keir, if Mr. Beskind approached you in the spring of 1965, why did you wait until January of 1966 to forward the information to the Legal Department?

Do you object?

MR. BAIN: Approached him for what, your Honor? That's what I want to know, approached him for what.

THE COURT: You are overruled.

THE WITNESS: If I could elaborate a little bit. When Mr. Beskind came to me as I testified, what he had in his possession was just a *sketch* and, as I recall it, a handmade sample, an *idea*, and it appeared that it would have *solved the problem for us.*

The next question would be, how much would it cost? *Can you make it?* Obviously, I guess Mr. Beskind felt he could make it when he came.

But these questions would take time to resolve. It would require correspondence back and fourth.

(Tr. 917; Emphasis added)

Very recently, the Third Circuit, in an opinion written by Judge Staley, had occasion succinctly to set forth the basic considerations underlying section 103:

Pursuant to the mandate of Article I, Section 8, of the Federal Constitution, Congress enacted 35 U.S.C. § 103. See Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). Section 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The United States Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966), has stated the following with respect to § 103:

. . . Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved . . .

In determining the obvious question, this court must consider *all* prior art whether or not the patentee knew of it. . . .

Layne-New York Company, Inc. v. Allied Asphalt Company, Inc., 501 F.2d 405 (3rd Cir. 1974). (Emphasis added)

■ This Court thus has the obligation to evaluate the C–6 envelope against the background of all of the prior art available before its creation, whether or not cited by Beskind to the Patent Office, indeed whether or not the particular piece of prior art was even known to Beskind before he conceived the C–6 envelope.

As Judge Adams has written in Trio Process Corporation v. L. Goldstein's Sons, Inc., *supra,* 461 F.2d at 69, n. 3:

Prior art has been defined as follows:

The existing state of knowledge in a particular art at the time an invention is made. It includes the issued patents * * *, publications, and all other knowledge deemed to be common thereto such as trade skills, trade practices, and the like. A. Smith, Patent Law Cases, Comments and Materials 2 (1964).

■ Once the prior art has been established, this Court must determine the skill level of one of ordinary skill in the art at the time of the invention, and, having ascertained the ability of this mythical ordinarily skillful man, determine whether, in light of the prior art, the claims of the patent in suit would be obvious to such a person.

The defendant has reminded this Court of the essential difficulties when lay judges make these evaluations, on the basis of hindsight, as to a product which had never been created before it was conceived by the claimed inventor (Defendant Speedmaster Post-Trial Brief, pp. 97 et seq.). The defendant appropriately quotes the following language of Judge Learned Hand in Reiner v. I. Leon Co., 285 F.2d 501, 504 (2nd Cir. 1960), cert. denied 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961):

To judge on our own that this or that new assemblage of old factors was, or was not, 'obvious' is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it.

And, as Judge Lacey observed in Anchor Plastics Co., Inc. v. Dynex Industries Plastics Co., 363 F.Supp. 582 at p. 596 (D.N.J.1973):

The simplicity inherent in hindsight is often misleading.

It is well settled that in retrospect the most creative developments often appear commonplace. The critical question is whether at the time of in-

vention the subject would have been obvious to one skilled in the art. Columbia Broadcasting System v. Sylvania Electronic Prod., Inc., 415 F.2d 719, 728 (1st Cir. 1969), cert. denied, 396 U.S. 1061, 90 S.Ct. 755, 24 L.Ed.2d 755 (1970).

See also, for example, Saf-Gard Products, Inc. v. Service Parts, Inc., 370 F. Supp. 257 (D.Ariz.1974) ; and Maschinenfabrik Rieter A. G. v. Greenwood Mills, 340 F.Supp. 1103 (D.S.C.1972).

■■■ These admonitions are sound ones.[17] The fact of the matter is that there is no credible evidence that anyone *before* Beskind ever produced or marketed an envelope *exactly* like the C–6. Gurewitz's testimony this court has dealt with elsewhere. Mota and Osborne, the officers of ADM, who do a substantial volume of business in C–6 envelopes, were themselves never able to account for how they first developed this form. Their only explanation, which was not persuasive, was that a customer sent them a sample or a sketch and asked that it be reproduced for him. They could not remember the name of the customer, nor had they any records of this transaction. In light of the importance of this envelope to their business, and the paucity of their recollections as to how they came to it, it would not be unfair to draw an inference that they simply copied it, not, as they say, from some unremembered customer, but from Beskind.

Notwithstanding all this, however, the claims of the patent in suit are not highly technical, requiring great expertise in mathematical equations or chemical formulae. The claims of the patent in suit, manifested by the C–6 model, concern only a polyethylene, waterproof packing slip envelope, an extremely simple device, readily understood by all. As defendant Speedmaster has phrased it,

"The ultimate question with respect to . . . all the prior art . . . is this: would one of ordinary skill in the art, presented with the problem confronting Beskind in March of 1965, and completely unaware of Beskind's solution, be led to what Beskind did ?"[18] Notwithstanding the commercial success of the C–6, and the fact that Beskind was the first to employ it, this Court, for the reasons which follow, finds that the C–6 envelope was obvious to anyone of ordinary skill in the art in 1965.

This Court has considered numerous patents, and models made from those patents, in seeking to find the prior art against which to judge the obviousness of Beskind's claimed invention. Among these, this Court considered the Sanford Patent (P–285, 286) and models (P–257, by Visual King; P–268, by Central Bag; and C–4) ; the Richmond Patent and models (C–3; P–299; and a polyethylene model P–269) ; the Frankel Patent and a model (P–23a, made by Beskind for purposes of this lawsuit) ; the Tinz Patent and a model (P–19a) ; the Knoll Patent (P–20, stipulated to be the same as Tinz model 19a) ; the Hopkins Patent (P–24) and model (P–24a) ; the Ellenbogen Patent (P–88) ; the Spurr Patent (P–22) ; and models (P–22a and P–226) ; and the G.S.A. Bag (C–5).

This Court has also considered the admissions made by Beskind in his pretrial deposition (May 22, 1969, pp. 228 et seq.), which as confirmed by the above patents and models, establish that before the C–6 was created it was:

1. Old in the art to make an envelope out of water impervious material.

2. Old in the art to join water impervious materials into an envelope by heat sealing three sides.

3. Old in the art to secure a packing list envelope by putting adhesive all on one side.

17. As Milton has written :
So easy it seemed
once found,
Which yet unfound
most would have thought impossible.

18. Defendant's Post Trial Brief, p. 98.

4. Old in the art to enclose all four sides with at least one slit for loading.

Both in the patent specification and during the prosecution of the patent in suit, the patentee alleged that patentable novelty resided in two structural elements of the C–6:

(a) when applied to a surface it presented no unadhesed flaps.

(b) it solved the problem in the art of providing a fully moisture resistant protective envelope.

During pre-trial depositions, the patentee described his alleged advance in the art as follows:

In the patented construction we have devised a method whereby the loading of the envelope is done through the slit in the back panel and there is no folding or bending of the flap required. The item merely slips inside of the shipping envelope. Therefore there is no folding or any other action. You merely strip off the backing paper and apply the shipping envelope flat to the surface of the carton or some other object. So we have got a large labor-saving in the removal of the necessity of folding and fiddling with the top flap and getting it water proof by folding it accurately. Our bag is water proof because the whole back surface is 100% covered with adhesive and 100% affixed to the carton and there is no place for the water to come. So we have an advantage in both the method of filling and in the method of applying and we end up with a product which has no loose surface and which is completely adhered to the carton or to the other object that it is intended to be affixed to.

(Tr. 811)

It is clear that the Sanford or Visual King envelope, C–4, is applied flat without any folding of any flaps to secure the invoice in the pocket. Therefore, the concept of not folding an envelope flap to secure the contents therein was old in the art, prior to the first C–6.

The Richmond envelopes P–629 and P–270, when closed and applied to the surface of a package present no unadhesed flaps. So also, the alternate form G.S.A. envelopes, P–88 and P–310, present no unadhesed flaps when closed.

Additionally, the Hopkins envelope when closed and applied to a surface also presents no unadhesed flaps, and the adhesive on the rear of that envelope closes the entrance to the pocket, except for a slot for the intrusion of a pencil tip for opening purposes.

Although Beskind denied that the Richmond envelope was water-resistant, ADM produced test results from United States Testing Company, Inc. which indicated that the Richmond was equally as water-resistant as the C–6 envelope.

In response, Speedmaster points to one additional factor:

What is important is that Beskind's invention was not merely to devise an envelope that would be entirely adhesed to a carton. He wanted to eliminate the flap altogether.

(Defendant Speedmaster Post-Trial Brief, p. 106)

Also, the Beskind deposition of May 22, 1969, at page 124: ". . . we have devised a method of loading and applying without having to fold a flap."

This too, however, was old in the art. The Frankel (P–23, P–23a), as old as 1956, is loaded without folding a flap. As will be developed more fully, when the Frankel is covered with adhesive on one side, it is a C–1. If the Frankel form is used with polyethylene sheets, rather than tubing, and fully adhesed on one side, it not only has no flap, *it is a C–6*.

It is, of course, settled law that the presumption of validity accorded to a patent is greatly weakened, if not extinguished, once it is demonstrated that significant prior art was not considered by the Patent Office. Layne-New York Company, Inc. v. Allied Asphalt Company, Inc., *supra;* Arrow Safety Device Co. v. Nassau Fastening Co., 496 F.2d

644 (3rd Cir. 1974).[19] This is very much the case at bar.

ADM contends, and Speedmaster does not deny, that neither the Hopkins, Sanford, Richmond nor Frankel patents were cited to the Patent Office by Beskind when he applied for his patent.

Inasmuch as this Court finds that these four patents were highly relevant, if not the most relevant prior art, it also finds that the statutory presumption in favor of the patent in suit has been gravely weakened.

Beskind testified during the trial that the Sanford, Richmond and Frankel patents would not point towards a C–6, but would actually lead *away* from the Beskind C–6 envelope (Tr. 875–876). This Court rejects this testimony. The simple fact is that it is quite obvious, even to a layman, that by simply combining certain of the attributes of a Frankel envelope with certain attributes of the Richmond envelope you have, if the tubular structure is used, a C–1 envelope; and if sheet polyethylene is employed, you have a C–6, the very patent in suit.

Indeed Beskind himself was forced to admit, albeit grudgingly, that this is so. Under examination, Beskind admitted that if a man of ordinary skill in the art saw a Frankel envelope and a Richmond envelope together, they would have suggested a C–1 (Tr. 864–866), which by stipulation is the equivalent of a C–6. He further admitted that the Frankel model, P–23a, with one slit in the rear instead of two, and adhesed all over its back *is* a C–1 (Tr. 846, 856–863). Furthermore, he conceded that if a Richmond polyethylene sheet envelope were to be constructed on the design of a Frankel, you would produce a C–6 envelope (Tr. 1056).[20]

Even without these admissions, however, this Court is compelled to this conclusion by a mere viewing of these rather simple devices. Thus, irrespective of Beskind's admissions or denials, this Court finds that the patent in suit is no more than a simple combination of old elements, long embodied in the Frankel and Richmond patents. Combinations of old elements may indeed be patentable, Layne-New York Company, Inc. v. Allied Asphalt Company, Inc., *supra,* but not when the combination thus formed is so readily obvious as is the C–6 patented envelope in suit.

This Court has considered the fact that the C–6 envelope has enjoyed widespread commercial success. It finds

19. This, of course, has nothing to do with the presumption of validity against the allegations of a "prior" inventor that he has himself invented the very thing years before. This latter presumption appears to be no more than the common sense application of suspicious, close scrutiny to the bare oral claim of prior invention, uncorroborated and unsupported by documents or other trustworthy evidence. The mere fact that the Patent Office did not consider relevant prior art before granting the patent, does not, in and of itself, make this type of testimony more reliable. Of course, an ultimate finding of obviousness by this Court would corroborate, at least somewhat, the oral claim of prior invention. If the invention was obvious, there is less reason to suspect the claim of prior invention.

Even so viewed, however, the testimony of Gurewitz remains unpersuasive. As this Court has already noted, even without a presumption of validity, and without the requirement to adduce "clear and convincing evidence," this Court would not invalidate the patent in suit on the basis of the Gurewitz testimony.

20. Beskind went to great length to assert that the Frankel envelope *always* contemplates a non-sealing situation, relying upon reference to its use as a book cover and suggesting this as its only use. This ignores the fact that Frankel expressly indicated that he had not attempted to catalog all of the possible uses of his container. Thus, the Frankel patent application states:

A device, such as shown in Figures 1 and 2 of the drawing and in fact in the modified showings of Figures 3 and 4, later described, *can be utilized for the covering or wrapping of any type of article* or product which may be disposed in one or more chambers or compartments of the resulting device and, as uses of devices of the kind under consideration are very expensive, *no attempt will be made to designate such uses.*

(Emphasis added)

# 1348

that the C–6 envelope has become the dominant structure used in the sales of envelopes by both ADM and Dennison. Moreover, this Court does not consider the commercial success of the C–6 envelope to be a mere "secondary consideration," to be looked to only if the Court already has a doubt as to whether or not the patented structure is obvious. The evidence of the commercial success of the C–6 envelope has been considered by this Court as primary evidence, along with the prior art, in making the initial determination as to whether or not the C–6 envelope was an obvious development.[21] As the Third Circuit has said, " . . . The commercial success of the . . . [patent in suit] . . . is a factor to be considered *in determining* the obviousness question as is copying by an alleged infringer." Arrow Safety Device Company v. Nassau Fastening Company, *supra*, 496 F.2d at p. 646. (Emphasis added)

21. See Giles S. Rich, Associate Judge, United States Court of Customs and Patent Appeals, "Laying the Ghost of the 'Invention' Requirement," an oration on 35 U.S.C. § 103 delivered to The Patent Law Associations of Los Angeles and San Francisco on September 18 and 20, 1972:

*"Secondary" or Circumstantial Considerations*

If a man is observed coming away from the scene of a murder with a bloody knife or a smoking pistol, the evidence thereof may be more convincing than what he says. So it is if a competitor suddenly gives up his way of doing things and switches to the invention or . . . after poo-pooing the invention and reporting that it won't work the defendant adopts it and uses it successfully on a large scale. Well, what did the Supreme Court say about such evidence? It said:

Such secondary considerations as commercial success, long felt but unresolved needs, failure of others, etc., [please note the 'etc.'; these are but exemplars] might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

Well of course they *do* have relevancy and the Supreme Court itself applied them in the *Adams Case*.

There is just one unfortunate word in that passage: 'secondary.' I don't think it should be given any weight though some courts seem to have done so, in effect, first deciding obviousness by visceral reaction and then saying that, having decided the issue, it is no longer necessary to consider the evidence—the best evidence—on the issue. This would be hard to explain except that in patent law there was an old rule—which also made no sense—that in determining 'invention' one took commercial success into account only in *doubtful* cases, to tip the scales when they were otherwise evenly balanced. I sense that courts or lawyers transported that old thinking into their dealing with § 103. If commercial success and similar circumstantial evidence was considered only in doubtful cases in determining 'invention' why not the same rule in determining non-obviousness?

I do not believe the Supreme Court intended to signify anything by the term 'secondary.' It could equally have said 'other considerations.' It cited a law review note entitled 'Subtests of Nonobviousness', not 'secondary' tests. I suggest that in thinking about those 'considerations' they be looked upon for what they factually are: *circumstantial evidence of the highest probative value*. As a judge, if I were presented with a defense of obviousness and the evidence showed that the defendant, long knowing about a problem in his product or his manufacturing process for which he had found no solution, changed over to use his competitor's patented invention as soon as he heard of it, I would not call that evidence 'secondary' and ignore it in considering his argument that it was an obvious invention. I would think, as did Learned Hand (Safety Car Heating and Lighting Co. v. General Electric Co., [2 Cir.], 155 F.2d 937, 939) in 1946 that:

In appraising an inventor's contribution to the art, * * * *the most reliable test* is to look at the situation before and after it appears. * * * Courts, made up of laymen as they must be, are likely either to underrate, or to overrate, the difficulties in making new and profitable discoveries in fields with which they cannot be familiar; and, as far as it is available, they had best appraise the originality involved by the *circumstances* which preceded, attended and succeeded the appearance of the invention. * * * We have repeatedly declared that in our judgment this approach is *more reliable* than a priori conclusions drawn from vaporous, and almost inevitably self-dependent, general propositions. (Emphasis added)

But, even as so viewed, the evidence of the commercial success of the C–6 envelope is outweighed by the compelling evidence, from all of the prior art, that it teaches nothing new, nothing that was not already obvious from the art prior to its creation. As the court has said in Continental Can Co. v. Crown Cork and Seal Co., 415 F.2d 601, 602 (3rd Cir. 1969), evidence of commercial success cannot support a finding of nonobviousness, "if it is established otherwise that a patent teaches nothing of significance that has not already been disclosed."

We therefore find that the claims of United States Patent No. 3,339,826 are invalid pursuant to 35 U.S.C. § 103 because the subject matter was obvious to one skilled in the art at the time the invention was made.

Although the Post-Trial Brief of ADM makes no specific mention of the malicious abuse of process claim against either defendant, we have been able to discern the gravamen of this charge against Dennison from ADM's counsel's statements at trial and its Reply Brief to the Post-Trial Reply Brief of Dennison which states:

Plaintiff and Third-Party Defendants' claim* against DENNISON for counsel fees is based upon the fact that DENNISON authorized the charge of infringement, participated in the writing of the letter charging infringement which plainly stated that plaintiff's conduct was inimicable to the interests of DENNISON, financed the litigation to the extent of approximately one-half of the fees, even while it was not a formal party, voluntarily joined as a formal party and continued prosecution of the suit until the early Spring of 1972.

(ADM Reply to Dennison Reply, p. 4. *The claim is malicious abuse of process.)

■■■■ In resolution of this allegation of malicious abuse of process, we are bound to apply the law of the State of New Jersey. Even though the process that was allegedly abused originated in this Federal District Court, the tort, if any, was committed in the State of New Jersey, and the law of that State is determinative both of the existence of a legal injury and of the character and measure of the damages recoverable. P.W. Siebrand v. Eyerly Aircraft Company, 185 F.Supp. 538, 540 (D.Or.1960); cf., Vancouver B & S Co. v. L. C. Smith & Corona Typewriters, Inc., 138 F.2d 635 (9th Cir. 1943).

■■■■ Under New Jersey common law, malicious abuse of process lies for the employment of process in a manner not contemplated by law. Regular and legitimate use of process, though with a bad intention, is not malicious abuse of process. The very essence of the action is the improper, unwarranted and perverted use of process after it has been issued in a manner not contemplated by law:

. . . Concededly, there are basically two elements necessary. The proofs must sustain the charge (1) that defendants made an improper, illegal, and perverted use of the process, i. e., *a use neither warranted nor authorized by the process;* and (2) *that in use of such a process there existed an ulterior motive.* Proof of the existence of the ulterior motive may be inferred from the improper act, but if the act be a proper one, the motive is immaterial. In the borrowed words of Chief Justice Beasley, writing for this court in Davis v. Flagg, 35 N.J. Eq. 491, 494, *'The legal pursuit of one's right, no matter what may be the motive of the promoter of the action, cannot be deemed either illegal or inequitable.'* Cf. Aalfo Co. v. Kinney, 105 N.J.Law, 345, 349, 144 A. 715; Louis Kamm, Inc. v. Flink, 113 N.J.L. 582, 585, 175 A. 62. And 'The test is, probably, *whether the process has been used to accomplish some unlawful end, or to compel the defendant to do some collateral thing which he could not legally be compelled to do.'*

(Ash v. Cohn, 119 N.J.L. 54, 194 A. 174 at p. 176 (E. & A. 1937). (Emphasis

**1350**

added) See also, Earl v. Winne, 14 N.J. 119, 101 A.2d 535 (1953); and Gambocz v. Apel, 102 N.J.Super. 123, 245 A.2d 507 (App.Div.1958).

■ During the course of this litigation ADM has stipulated that its complaint against Dennison for malicious abuse of process rests, exclusively, on its claim that Dennison, with actual knowledge that the patent in suit was invalid by reason of the Beskind-Dennison anticipation, in bad faith charged and counterclaimed against ADM as an infringer of an invalid patent (Tr. 1572 et seq.). This Court's determination that Beskind did not offer either the C–1 or the C–6 for sale to Dennison more than one year prior to his application for the patent in suit determines the issue of malicious prosecution and abuse of process against ADM and in favor of Dennison.[22]

■ ADM and the Third-Party Defendants have also charged Speedmaster with malicious abuse of process and sought as damages their attorney's fees. We must reiterate that ADM has again failed to establish the necessary elements of the tort.[23] ADM consistently refers to 35 U.S.C. § 285 as a basis for an award of reasonable counsel fees, and also claims attorney's fees as damages for the alleged malicious abuse of process. We think that ADM has totally misconstrued the applicability of 35 U. S.C. § 285, which provides for the award of reasonable counsel fees to the prevailing party in litigation in exceptional cases. The purpose of 35 U.S.C. § 285 is to prevent gross injustice in patent litigation and can be predicated upon fraud practiced upon the Patent Office or vexatious or unjustified litigation. Pennsylvania Crusher Co. v. Bethlehem Steel Co., 193 F.2d 445, 451 (3rd Cir. 1951). The authority to award attorney's fees found in 35 U.S.C. § 285 is limited to the patent side of the case, not the non-patent side of the litigation. Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 407 F. 2d 288, 297 (9th Cir. 1969). The award of attorney's fees under 35 U.S.C. § 285 bears no relation whatever to the common law tort of malicious abuse of process.

■ Defendant Speedmaster, Plaintiff ADM and Third-Party Defendants Mota and Osborne have requested this Court to find that this case is exceptional within the provisions of 35 U.S.C. § 285,[24] thus entitling the award of attor-

---

**22.** In order that this Court's findings be complete, this Court further finds that even in the event that it had found that there had been such anticipation, there is a total lack of proof of any *actual* knowledge on the part of Dennison of the invalidity of the patent, and a total lack of proof of any deliberate intent by Dennison to harass, annoy or injure ADM. The record reveals no more than Dennison's *attempt* to litigate an issue about which there is conflicting testimony.

**23.** ADM filed no post-trial brief on this claim against Speedmaster, and it is not clear whether ADM still presses this count of its complaint. ADM's post-trial brief does enumerate eight specific instances which it claims would entitle ADM to an award of attorney's fees under 35 U.S.C. § 285; however, these alleged incidents and the proofs at trial are insufficient to permit a finding that Speedmaster has committed the tort of malicious abuse of process. (ADM Post-Trial Brief, pp. 78–84)

**24.** Plaintiff and Third-Party Defendants have predicated their claim for attorney's fees pursuant to 35 U.S.C. § 285 on eight alleged incidents of misconduct, bad faith or fraud by the Defendant Speedmaster which they claim entitle them to attorney's fees under the exceptional prerequisite of the statute. Plaintiff and Third-Party Defendants also claim that Dennison is jointly and severally liable with Speedmaster up to and including the time it filed application for leave to dismiss its charge of infringement. This claim is also made pursuant to 35 U.S.C. § 285 and is based upon several alleged incidents which allegedly would transform this litigation into an exceptional patent case. (ADM's Post-Trial Brief, pp. 78–84)

We do not find that either defendant has been guilty of bad faith, fraud, or misconduct in any of the incidents which Plaintiff and Third-Party Defendants allege as a basis for characterizing the suit as an exceptional case, entitling them to the award of attorney's fees.

ney's fees to the prevailing party. The exceptional case contemplated by the statute occurs when it would be grossly unjust to make the winning party bear its own attorney's fees. This case does not warrant such a finding; therefore, it is without the purview of 35 U.S.C. § 285.

This opinion constitutes the Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.

■ Plaintiff, Third-Party Defendants and Defendant Speedmaster shall bear their own costs. Dennison's costs are assessed against Plaintiff ADM.[25]

Counsel for the plaintiff will prepare and submit, on notice, an appropriate order within ten (10) days.

---

Defendant Speedmaster also alleges several instances in which it claims ADM's conduct has been characterized by bad faith. (Speedmaster Post-Trial Brief, pp. 112–113) We fail to find that ADM has been guilty of such misconduct or bad faith as to entitle an award of attorney's fees to Speedmaster.

25. Pursuant to the standards for the assessment of costs as enunciated by the United States Court of Appeals for the Third Circuit in Fruehauf Corporation v. International Terminal Operating Co., Inc., 505 F.2d 730 (3rd Cir., 1974), we do not assess costs against Speedmaster or Dennison on the issues of patent invalidity and infringement. The patent in suit was attacked on a broad range of issues. Invalidity by reason of anticipation was alleged on the *Gurewitz-Central Bag* experience in 1964. Then there was the claim that Beskind had in two ways anticipated his own patent, vis-a-vis Dennison.

The Court spent a great deal of time scrupulously reviewing these allegations both in the pretrial stage, on motion for summary judgment and at the trial, itself. Indeed, the great bulk of the testimony received related in one way or another to these allegations.

While it is true that the plaintiff did prevail ultimately on the issue of obviousness, it is also true that the issues raised by the plaintiff and its attacks based on anticipation were in the Court's view without merit.

It is the finding of this Court that the trial of this matter was attenuated merely by reason of the unmeritorious, and in the *Gurewitz* instance virtually frivolous, attacks made on the patent by reason of anticipation.

Had plaintiff in this case confined itself to an attack on this patent based on obviousness, it would have prevailed just as surely but at far less costs both to the parties and to the public. Had it done so, the Court would have given costs to the plaintiff as a matter of course. Under these circumstances, however, it smacks of unfairness to award costs based on an attenuated trial which was largely the fault of the party which prevailed on other grounds.

The question now arises as to whether or not the defendant Dennison is entitled to costs against the plaintiff for, in this lawsuit as between the plaintiff and third-party defendants and the defendant Dennison, Dennison is the prevailing party.

It should be noted that during trial the plaintiff took the position that the only allegation in the complaint which bore upon the defendant Dennison was a claim that Dennison had wronged the plaintiff by a malicious abuse of process. Dennison is not only the prevailing party in regard to this cause between itself and the plaintiff but a scrupulous reading of the record has revealed a dearth of evidence upon which such a claim could be predicated. Moreover, in its post-trial briefings, proposed findings of fact and conclusions of law, plaintiff, apparently in recognition of this fact, devoted nothing by way of argument to sustain its claim against Dennison for malicious abuse of process. Indeed, the Court is mindful of the fact that at the close of the plaintiff's case, when the Court was greatly tempted to dismiss as to Dennison, the plaintiff argued strongly that this should not be done and that Dennison should be kept in throughout the entire case.

The Court acceded to plaintiff's request, reserved on the question of dismissal at the close of the plaintiff's case and required the defendant Dennison to go to judgment.

Based on the *Fruehauf* opinion of the United States Court of Appeals, this Court could give no reason for not awarding costs to the defendant Dennison.

Accordingly, the Clerk of the Court shall tax costs, including the cost of the transcript, for the period commencing with the first (1st) day of trial and concluding with entry of Judgment, against the plaintiff and in favor of the defendant Dennison.